[No. 41307-8-II.   Division Two.   March 6, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. KEITH RAGNER BERLIN, *Appellant*.

114

*Eric J. Nielsen* (of *Nielsen, Broman & Koch PLLC*), for appellant.

*Deborah S. Kelly, Prosecuting Attorney,* and *Brian P. Wendt, Deputy,* for respondent.

¶1 VAN DEREN, J. — Keith Berlin appeals his conviction for first degree assault and the trial court's imposition of domestic violence and firearm sentence enhancements. He argues (1) we should vacate his enhanced sentence based on a *Bashaw*[1] instructional error and (2) we should reverse and remand for a new trial because the trial court violated his constitutional right to confront adverse witnesses by limiting the scope of cross-examination of one witness and denying Berlin's offer of testimony from another witness. We hold that Berlin may not raise the issue of instructional error under *Bashaw* for the first time on appeal and that the confrontation clause violation, if any, was harmless error. We affirm.

## FACTS

¶2 Berlin and Jacob Griffith began living together in Berlin's mother's small mobile home in October 2009. On February 15, 2010, according to Griffith, he awoke around 6:00 p.m., walked into the kitchen, and saw Berlin sitting at a desk while speaking on the telephone. When Berlin hung up, the two had an "exchange of words," and Berlin went into his bedroom and closed the door. Report of Proceedings (RP) at 84-85. Griffith, thinking Berlin's behavior was odd, followed him, knocked on the bedroom door, and asked what was wrong. Without opening the door, Berlin replied that Griffith had been rude and inconsiderate because he had interrupted Berlin's telephone call.

¶3 Griffith returned to the living room, sat down on a couch, and called his girl friend, Erika Delgado. He told her that something was wrong with Berlin and concluded the

---

[1] *State v. Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010).

conversation when Berlin walked into the room. Berlin "glared" at Griffith and again accused him of being rude and disrespectful, and Griffith returned the sentiment. Berlin, who appeared angry and intoxicated, threatened to call Griffith's grandmother and tell her "how sorry of a person" Griffith was, and then Griffith threatened to call Berlin's mother. RP at 88. After the two agreed not to make the telephone calls, Berlin told Griffith, " 'Just leave me alone . . . I'm going to sleep it off,' " went back into his room, and closed the door. RP at 89.

¶4 Griffith telephoned Delgado a second time, told her about his difficulties with Berlin, and asked if he could move in with her. Berlin came back into the living room and angrily accused Griffith of calling Berlin's mother; Griffith responded that he had called only Delgado. Berlin demanded that Griffith move out and, when Griffith told him that he was arranging to do that but could not leave that night, Berlin insisted that he leave immediately. Griffith threatened to call Berlin's mother and ask for permission to stay another night, the two continued to argue, and Berlin again returned to his room.

¶5 Soon after, Berlin exited the mobile home and went to his car. Griffith warned Berlin not to drive because he was intoxicated, and the two continued to argue until Berlin came back inside. Griffith grabbed Berlin by the shoulders, asked him what was wrong, and hugged him in an attempt to calm him down. The two embraced for a moment before Berlin shoved Griffith away, warned Griffith never to touch him again, and threatened to call the police.

¶6 Griffith returned to the couch, called Delgado a third time, and told Berlin that he was leaving that night and that Delgado would pick him up the next morning. When Berlin expressed disbelief, Griffith enabled his cell phone's speaker phone function and Griffith asked Delgado if she was willing to take him in despite Berlin's claim that he had "laid hands" on Berlin; Delgado said she was and that she would pick Griffith up the next morning. RP at 98. Berlin said, "Okay," and left the room. RP at 99.

¶7 Griffith, who remained on the couch speaking with Delgado on the telephone, saw movement three to four feet away and heard a "pow" or "bam" sound. RP at 100. Berlin shot Griffith in the right side of his face with a .22 caliber rifle loaded with birdshot. Berlin dropped the rifle at the foot of the couch; he stood over Griffith while brandishing a pocketknife and said, " 'I'm going to stab you. I'm going to cut you. I'm going to kill you.' " RP at 102. Hearing Delgado screaming over the telephone, Griffith shouted for her to call the police and fled the residence. Delgado's subsequent recitation of the evening's events was consistent with Griffith's.

¶8 Berlin's account of the night's events substantially differed from Griffith's and Delgado's. According to Berlin, earlier that morning he had angered Griffith because he told Griffith that he would no longer purchase methamphetamine for them both and Griffith felt it was unfair that Berlin would purchase alcohol for himself but would not purchase methamphetamine they both could use. That evening, Berlin was sitting at his desk and drinking whiskey. After Griffith came into the room, Griffith became "increasingly agitated" because Berlin was drinking. RP at 321. Suddenly, he stood right beside Berlin and said, " 'I'll kill you.' " RP at 321.

¶9 Although Berlin did not immediately feel threatened because he and Griffith had "joked around in the past," he told Griffith to move out that night. RP at 322. Griffith told him that he could not do so, the argument "escalated," and Berlin told Griffith to ask Delgado if he could stay with her. RP at 324. After Griffith called Delgado, Griffith reiterated to Berlin that he could not move out that night. Berlin again demanded that he do so, and Griffith said, "I could kill you." Berlin felt fearful after this second threat because Griffith was "very agitated"; he had "a look in his eye that [Berlin] didn't like"; he had told Berlin in the past that he had "Navy SEAL training"; and he was bigger, stronger, and in better health than Berlin. RP at 327, 329. Berlin admitted that he

"[m]ay have been" too intoxicated to drive and that he "may have" smoked marijuana that evening. RP at 352.

¶10 Berlin told Griffith to call Delgado again, and he did so. Griffith then put Berlin on speaker phone; Berlin asked Delgado whether she wanted Griffith living with her when he had threatened Berlin's life, and she said, " 'Yeah.' " RP at 326. While Griffith continued speaking with Delgado, Berlin went into the bathroom; when he came out, Griffith grabbed him by the shoulders and told him that if he "tried to call [Berlin's] family, [Griffith's] family, or 9-1-1 that [Griffith] could get to [him] before they got there." RP at 332. Griffith released him and then went into the living room, where he sat on the couch and resumed speaking with Delgado.

¶11 Berlin felt that his life was in danger at this point due to the repeated threats; Griffith's agitated demeanor; and his "height advantage, size, youth, strength, [and] training." RP at 332. Berlin stated that he retrieved the .22 rifle, took a few steps into the room, and shot Griffith without warning from six feet away because he feared Griffith would take the rifle away and use it on him if he called out or got too close. Berlin intended to disable Griffith, so he aimed for Griffith's shoulder, but he shot him in the face because Griffith turned toward him as he fired the gun. He then stood over Griffith with a pocketknife and said, " 'Get out, and don't make me finish it.' " Griffith then fled the mobile home. Berlin did not observe that Griffith was armed at any time during the evening.

¶12 Griffith suffered "a number of very small puncture wounds to the face" and lost some vision in his eye. RP at 61. A number of the birdshot pellets penetrated the inner and outer bones of the sinus cavity beneath his eye, and a few crossed the nasal septum. The pellets could have penetrated to Griffith's brain or severed arteries and veins in his neck, possibly resulting in fatal infection or blood loss.

¶13 Griffith required plastic surgery to repair his face and multiple procedures to remove as many of the pellets as

possible from his face and eye. Over 200 pellets remained in his face, and some could not be removed without causing further damage. Forensic evidence showed that Berlin shot Griffith from a distance of two to four feet.

¶14 The State charged Berlin with attempted second degree murder and first degree assault, with firearm and domestic violence enhancements on each count. Before trial, the State moved to preclude Berlin from introducing an out-of-court statement written by Berlin's now-deceased mother, Evelyn Berlin.

¶15 According to Evelyn's[2] statement, Griffith called her twice on April 25, 2010, after Berlin was charged, and offered to "sign a statement saying he would not ask for the maximum sentence and would not pursue a civil suit against [Berlin]" in exchange for $1,500. Ex. 55, at 1. Her statement also recited that on May 14, Griffith called her again, asked for $1,000, and stated that he could "either say [Berlin] didn't know the gun was loaded and shot him by accident" or say Berlin "deliberately shot him then attacked him with a knife." Ex. 55, at 2. The statement also said that Evelyn never accepted Griffith's offer, that her daughter was present during one call, and that her granddaughter was present during the other.

¶16 Berlin argued that the written statement provided a "good faith basis to inquire of . . . Griffith whether he in fact solicited [Evelyn] for money in order to change or shape his testimony." RP at 28. The trial court reserved its ruling until it could examine Griffith outside the presence of the jury, stating:

> [T]here's no way . . . to substantiate [whether Griffin solicited Evelyn] since [Evelyn] is now deceased. And I believe it would be inappropriate to suggest to the jury that a witness is willing to sell his testimony without the ability to substantiate such a suggestion or an ability to rebut or disprove it. . . . [I]f you look at the rules in regard to impeachment and—on bias and so

---

[2] We refer to Evelyn Berlin by her first name for clarity. We mean no disrespect.

forth that if you're using . . . extrinsic evidence of a prior act to do that, then if a witness gets up and says, no, it didn't happen, that's the end of the inquiry, at least on impeachment purposes.

RP at 50-51. Before Griffith testified at trial, the trial court examined him outside the presence of the jury and he denied making the statements set out in the proffered letter. Over Berlin's objection, the trial court prohibited him from cross-examining Griffith about the writing containing Evelyn's statements.

¶17 On the third day of trial, Berlin notified the trial court that his cousin, Robert Haines, had visited Evelyn in May during one of Griffith's calls. Berlin offered evidence that according to Haines, Evelyn had hearing problems and had Haines listen to the call, during which Griffith offered—in exchange for $1,500—to alter his testimony and to state that Berlin did not intend to shoot or to hurt him and that a sentence of three to five years would be appropriate.

¶18 The trial court prohibited Haines from testifying on the subject, reasoning that (1) Evelyn's written statement did not mention Haines' presence during any of the calls; (2) Haines' proposed testimony was not relevant because it appeared to refer to Griffith's April 15 call offering settlement of a potential civil suit and a recommendation of leniency, not alteration of his testimony; and (3) Haines was disclosed as a witness very late in the trial and after the parties had excused Griffith from the proceedings. The trial court allowed Haines to testify at trial on other matters.

¶19 Jury instruction 12 provided, "A person commits [first degree assault] when, with intent to inflict great bodily harm, he or she assaults another with a firearm or with any deadly weapon or by any force or means likely to produce great bodily harm or death." Clerk's Papers (CP) at 46. Jury instruction 14 defined "great bodily harm" as "bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of

the function of any bodily part or organ." CP at 48. Jury instruction 15 stated that "[a] firearm, whether loaded or unloaded, is a deadly weapon." CP at 49.[3]

¶20 The jury returned a guilty verdict on the first degree assault charge. It also returned special verdicts finding that (1) Berlin was armed with a firearm when he assaulted Griffith and (2) Berlin and Griffith were members of the same household. When polled by the trial court, the jury was unanimous in its special verdict findings. At sentencing, the trial court imposed a standard range sentence of 153 months, including a 60-month firearm enhancement. Berlin appeals.

## ANALYSIS

### SPECIAL VERDICT UNANIMITY INSTRUCTION

¶21 Citing *Bashaw*, Berlin argues for the first time on appeal that the trial court erred in instructing the jury that

---

[3] We recite the pertinent jury instructions for later reference. Jury instruction 25, the assault self defense instruction, provided:

> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.
> The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

CP at 59. Jury instruction 29 provided:

> If you find [Berlin] guilty of these crimes, you will then use the Special Verdict Forms and fill in the blanks with the answer "Yes" or "No"' according to the decision you reach. Because this is a criminal case, all twelve of you must agree in order to answer the Special Verdict Forms. In order to answer the Special Verdict Forms "Yes," you must unanimously be satisfied beyond a reasonable doubt that "Yes" is the correct answer.

CP at 64. Jury instruction 30 stated, "For purposes of a special verdict, the State must prove beyond a reasonable doubt that [Berlin] was armed with a firearm at the time of the commission of the crime in Counts I or II. A 'firearm' is a weapon or device from which a projectile may be fired by an explosive such as gunpowder." CP at 65. Finally, jury instruction 31 provided, "For purposes of this case, 'family or household members' means adult persons who are presently residing together or who have resided together in the past." CP at 66.

it must be unanimous to return a "Yes" or "No" answer on a special verdict about whether he committed a crime while armed with a firearm and whether he and Griffith were members of the same household, and that this error requires reversal of his firearm and domestic violence sentence enhancements. We hold that Berlin may not raise this issue for the first time on appeal. *State v. Grimes*, 165 Wn. App. 172, 175, 267 P.3d 454 (2011), *petition for review filed*, No. 86869-7 (Wash. Jan. 3, 2012).

¶22 RAP 2.5(a)(3) provides, "The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed error[ ] for the first time in the appellate court: . . . manifest error affecting a constitutional right."

## A. Berlin's Alleged Error Not "Constitutional"

■ ¶23 Here, the jury received a special verdict instruction substantially similar to the erroneous jury instruction the *Bashaw* jury received: "Because this is a criminal case, all twelve of you must agree in order to answer the Special Verdict Forms." CP at 64; *see also* 169 Wn.2d at 139. Division One and Division Three of this court recently held that unanimous "no" special verdict jury instructions held erroneous under *Bashaw* do not constitute constitutional error that defendants can raise for the first time on appeal under RAP 2.5(a)(3). *State v. Morgan*, 163 Wn. App. 341, 352-53, 261 P.3d 167 (2011), *petition for review filed*, No. 86555-8 (Wash. Oct. 3, 2011); *State v. Guzman Nunez*, 160 Wn. App. 150, 158-60, 164-65, 248 P.3d 103, *review granted*, 172 Wn.2d 1004 (2011). *But see State v. Ryan*, 160 Wn. App. 944, 948-49, 252 P.3d 895, *review granted*, 172 Wn.2d 1004 (2011).[4] We also recently reached the same holding. *Grimes*, 165 Wn. App. at 175. Accordingly, we hold that Berlin may

---

[4] In August 2011, our Supreme Court granted review in *Nunez* and *Ryan* and consolidated them. *Grimes*, 165 Wn. App. at 184 n.13. The Supreme Court stayed *Morgan* and *State v. Campbell*, 163 Wn. App. 394, 404, 260 P.3d 235 (2011), *petition for review filed*, No. 86593-1 (Wash. Oct. 12, 2011) pending resolution of *Nunez* and *Ryan*. We discuss *Campbell* later in this opinion.

not raise this error for the first time on appeal because it is not constitutional in nature.

## B. Berlin's Alleged Error Not "Manifest"

■ ■ ¶24 But even if our Supreme Court ultimately holds in *Ryan* and *Nunez* that this particular instructional error is based on constitutional protections, in Berlin's case it is not "manifest."[5] For an error to be "manifest," the defendant must show that the asserted error had practical and identifiable consequences at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011). To ascertain whether the trial court could have corrected the error given its knowledge at the time, the appellate court must place itself in the trial court's shoes when determining if the alleged error had practical and identifiable consequences. *State v. O'Hara*, 167 Wn.2d 91, 100, 217 P.3d 756 (2009).

■ ¶25 In *Grimes*, we held that the instructional error could not have had a practical and identifiable consequence at trial because (1) "unlike Bashaw, Grimes did not cast doubt on the existence of the evidence supporting the imposition of the sentence enhancement on the record at trial," (2) "unlike in [*State v.*] *Goldberg*, [149 Wn.2d 888, 891-92, 894, 72 P.3d 1083 (2003),] the record d[id] not show that the jury disagreed about whether the sentence enhancement was proved beyond a reasonable doubt," and (3) "Grimes's jury was not instructed to deliberate to unanimity after first returning a verdict that was not unanimous on the sentence enhancement." *Grimes*, 165 Wn. App. at 189-90.

¶26 As in *Grimes*, Berlin does not cast doubt on the existence of the evidence supporting the domestic violence and firearm sentence enhancements. His testimony estab-

---

[5] We address whether the error Berlin asserts is "manifest" under RAP 2.5(a)(3) because our analysis will serve as an alternative basis for ruling that Berlin does not meet the test for raising this error for the first time on appeal, even if our Supreme Court ultimately holds that this type of instructional error is constitutional.

lished that he used a rifle to shoot Griffith, who lived with him and was, thus, a member of the same household.

¶27 Further, the record shows that the jury unanimously agreed during polling that the State had proved the factual basis of the sentence enhancements beyond a reasonable doubt and, thus, there was no instruction to deliberate until unanimous after first returning a verdict that was not unanimous on the enhancements, as in *Goldberg*. Accordingly, Berlin fails to demonstrate a "manifest" constitutional error capable of review for the first time on appeal under RAP 2.5(a)(3).

C. Berlin's Alleged Error Is "Harmless"

¶28 Because the instructional error that Berlin challenges for the first time on appeal is not manifest, we need not address whether, in the context of the entire record, the error is harmless beyond a reasonable doubt. *O'Hara*, 167 Wn.2d at 99. But again, in light of the Supreme Court's consolidated review of *Nunez* and *Ryan*, we address this issue. *Accord Grimes*, 165 Wn. App. at 184 n.13. Assuming without deciding that the instructional error was constitutional in nature, the error was harmless if we find beyond a reasonable doubt that it did not contribute to the verdict obtained. *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002).

¶29 In a recent Division One case, *State v. Campbell*, 163 Wn. App. 394, 404, 260 P.3d 235 (2011), *petition for review filed*, No. 86593-1 (Wash. Oct. 12, 2011), the State argued that a *Bashaw* special verdict instructional error was harmless based on the strength of the evidence supporting the jury's special verdict. The Division One panel, however, rejected this approach in a split decision, holding that "Supreme Court decisions—and simple logic—make clear that neither the strength of the State's evidence nor the jury's findings on a general verdict can substitute for a properly instructed jury's determination on a special verdict regarding sentence enhancements." *Campbell*, 163 Wn. App. at 406.

¶30 In support of its holding, the *Campbell* majority cited *State v. Recuenco*, 154 Wn.2d 156, 159, 110 P.3d 188 (2005), *rev'd and remanded*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006), *aff'd*, 163 Wn.2d 428, 180 P.3d 1276 (2008) and *State v. Williams-Walker*, 167 Wn.2d 889, 893-94, 225 P.3d 913 (2010). *Campbell*, 163 Wn. App. at 404-06. But, as the dissenting opinion correctly observed, those were cases in which the trial court erroneously imposed firearm sentence enhancements after the jury returned a special verdict that the defendant was armed with a deadly weapon, thus supporting only imposition of a lesser deadly weapon enhancement.[6] *Campbell*, 163 Wn. App. at 410-11 (Appelwick, J., dissenting). Thus, "[t]he question in those cases was whether the [trial] court had the authority to enter its verdict without a jury finding." *Campbell*, 163 Wn. App. at 411 (Appelwick, J., dissenting). In contrast, the question in *Bashaw* special verdict instruction cases is whether we can conclude beyond a reasonable doubt and in the context of the entire record that the instructional error did not contribute to the jury's special verdict finding.

¶31 The *Campbell* majority also relied on our Supreme Court's focus on the " 'flawed deliberative process' " caused by the erroneous special verdict jury instruction. *Campbell*, 163 Wn. App. at 404 (quoting *Bashaw*, 169 Wn.2d at 147). Although the *Campbell* majority stated that this focus "allow[s] for the theoretical possibility of harmless error in this context," it later concluded that "being told the wrong thing . . . is not harmless, as *Bashaw* makes clear." 163 Wn. App. at 404, 406.

¶32 In *Grimes*, we acknowledged that the *Bashaw* court "suggest[ed], but d[id] not hold, that an erroneous unanimous special verdict instruction cannot be deemed harm-

---

[6] In fact, the *Williams-Walker* court expressly stated that harmless error analysis did not apply to the errors in that case and in *Recuenco* because the trial courts' errors "occurred in the sentencing phase," not during trial or in the jury instructions, findings, or verdicts. 167 Wn.2d at 901. If anything, *Williams-Walker* undermines, not supports, the *Campbell* court's reasoning.

less beyond a reasonable doubt because the instructional error affects the procedure by which unanimity would be achieved." 165 Wn. App. at 190 (citing *Bashaw*, 169 Wn.2d at 147-48). But we cannot divorce the focus on the "flawed deliberative process" in our analysis of these instructional errors from the context of the entire record, including the State's evidence. If we focused only on the "flawed deliberative process," then this error would automatically require reversal in every case in which the jury receives the flawed special verdict instruction. Thus, the error could never be harmless, i.e., it would be a "structural"[7] error. *State v. Jennings*, 111 Wn. App. 54, 62-63, 44 P.3d 1 (2002). The *Bashaw* court, however, did not hold that an erroneous unanimous special verdict instruction was structural error; instead, it applied harmless error analysis. 169 Wn.2d at 147. Thus, despite any contrary suggestions in *Bashaw* and *Campbell*, under harmless error analysis, we must consider the effect of the "flawed deliberative process" in the context of the entire record, including the State's evidence. *See O'Hara*, 167 Wn.2d at 99.

¶33 For example, in *Bashaw*, the jury heard no properly admitted, direct evidence establishing the necessary distance for the three alleged school bus route stop enhancements. 169 Wn.2d at 138, 143; *see also Grimes*, 165 Wn. App. at 191 (stating the same). The only properly admitted evidence the jury heard regarding the necessary distance was either indirect or conflicting, thus casting doubt on the procedure by which the jury achieved unanimity on the special verdicts. *See Bashaw*, 169 Wn.2d at 138-39; *see also*

---

[7] A " 'structural' " error not subject to harmless error review is a " 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). "An error is structural when it 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " *State v. Momah*, 167 Wn.2d 140, 149, 217 P.3d 321 (2009) (internal quotation marks omitted) (quoting *Recuenco*, 548 U.S. at 218-19), *cert. denied*, 131 S. Ct. 160 (2010). Only in a very limited number of cases are errors "structural" and, thus, subject to automatic reversal. *Neder*, 527 U.S. at 8.

*Grimes*, 165 Wn. App. at 191. In contrast, because Grimes did not challenge the uncontroverted evidence that his crime occurred the necessary distance from a school bus route stop, we concluded that the procedure by which the jury achieved unanimity was harmless beyond a reasonable doubt. *Grimes*, 165 Wn. App. at 191.

¶34 Like Grimes, Berlin does not challenge the uncontroverted evidence that he shot Griffith, his roommate, in the face with a rifle. His testimony established both facts. Thus, the procedure by which the jury unanimously found (1) that Berlin was armed with a firearm when he assaulted (2) a member of the same household was harmless beyond a reasonable doubt.

¶35 We hold that Berlin fails to demonstrate either a "constitutional" or a "manifest" error under RAP 2.5(a)(3), as he offered no evidence that it had practical and identifiable consequences at his trial. Thus, this error was not preserved for appeal and it is not subject to review for the first time on appeal. Nevertheless, for completeness, we have reviewed the entire record on appeal and hold that any such error was harmless beyond a reasonable doubt in the context of Berlin's trial as it did not affect his rights at trial or the jury's verdict.

¶36 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

WORSWICK, A.C.J., and JOHANSON, J., concur.

Review denied at 174 Wn.2d 1009 (2012).