[No. 43108-4-II.   Division Two.   March 25, 2014.]

THE STATE OF WASHINGTON, *Respondent*, v. BRYAN L. HART, *Appellant*.

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*), for appellant.

*H. Steward Menefee, Prosecuting Attorney*, and *Jason F. Walker, Deputy*, for respondent.

¶1 HUNT, J. — Bryan Hart appeals his jury convictions for second degree assault and misdemeanor harassment (domestic violence); he also appeals the firearm sentencing enhancement on his assault conviction. He argues that (1) because the trial court erroneously allowed the State to cross-examine him about topics that violated his Fifth Amendment rights, his harassment conviction violated his right to free speech; (2) the trial court violated his right to a public trial when it met with counsel twice in camera to discuss jury instructions; (3) the evidence was insufficient to support his firearm sentencing enhancement special verdict and his second degree assault conviction; (4) the trial court erred when it failed to instruct the jury about definitions relating to the firearm enhancement and the harassment charge; and (5) he received ineffective assistance when his counsel failed to make certain evidentiary objections and failed to raise a mental health defense. Holding that the State fails to overcome the prejudice presumed from its unconstitutional cross-examination of Hart, we reverse his harassment conviction, but we affirm Hart's second degree assault conviction and firearm sentencing enhancement.

## FACTS

### I. CRIMES

¶2 Jennifer Hargrove reported to Hoquiam Police Department Officer Cody Blodgett "concern" that her ex-boyfriend, Hart, had sent her several threatening text messages that evening. Report of Proceedings (RP) (Jan. 11, 2012) at 49. These text messages included the following statements:

> You should leave town today, right f*ck now before I find you. . . . You will learn respect if you learn nothing else from me. . . . No, you or him don't understand respect. I'm fine being in prison. It's my destiny. . . . If my d*ck is f*cked up, you're—you're next, stripper whore. . . . Don't worry, slut. I'm

going to f*ck you up and him. No, this is what I was born to do. I kill people. I'm tired of your lies. This is what I was born for.

RP (Jan. 11, 2012) at 40-42. The police decided to contact Hart.

¶3 Because of a previous firearm incident at Hart's residence, the police suspected that he might again have a firearm. Blodgett arrived at Hart's house at 3:00 the morning after Hargrove's report, accompanied by four other uniformed officers positioned in a perimeter around the residence. Blodgett knocked on the door, announced that he was with the Hoquiam Police Department, and addressed Hart by his first name. Hart opened the door, acknowledged the officer's presence, and shut the door. Minutes later, the front door opened again and Hart walked out with a small black pistol in his hand, scanning the area. Blodgett ordered Hart to drop the gun. Hart aimed the gun in the officers' direction, abruptly retreated back into the house, and slammed the door. The police negotiated with Hart without further confrontation until around 10:45 a.m., when they finally persuaded him to leave his residence and arrested him. Inside Hart's residence, the police found a Glock 17 9 mm handgun lying on the couch next to Hart's front door, two fully loaded magazines for the firearm on the floor, and "a couple of bullets loose on the floor." RP (Jan. 11, 2012, afternoon) at 45.

## II. PROCEDURE

¶4 The State charged Hart with second degree assault with a firearm enhancement and misdemeanor harassment (domestic violence). At the jury trial, the officers testified to the facts previously described. Sergeant Shane Krohn further testified that Hart's handgun, seized from his home, "looks to be in very working order," and that it did not "look to be damaged or anything." RP (Jan. 11, 2012, afternoon) at 43. Hart did not object to the State's offer of the gun or the magazines into evidence.

¶5 Hargrove testified that Hart had sent her the text messages but that she had not been concerned for her safety or the safety of others; rather, she "was more concerned about how he was feeling." RP (Jan. 11, 2012) at 43. When the State asked if Hart had "ever done anything in [her] presence to make [her] believe that he would carry out these threats" in the texts, she responded, "No." RP (Jan. 11, 2012) at 45. She also confirmed that she had written and signed a police statement under penalty of perjury that "I never felt I was ever in any danger and still don't." RP (Jan. 11, 2012, afternoon) at 51.

¶6 On direct examination, Hart testified about his interactions with the police and about the assault charge; he did not, however, testify about the texts he had allegedly sent to Hargrove. When the State attempted to cross-examine Hart about the content of these text messages, he objected that these questions went beyond the scope of his direct examination.[1] The trial court overruled the objection.

¶7 The State then cross-examined Hart with repeated pointed questions about the texts and other personal subjects, forcing Hart to divulge specific incriminating information: The State elicited from Hart (1) that he "probably" or "might have" sent the texts, but was not certain; (2) details about the meaning of the texts[2] and about his

---

[1] Hart did not object on Fifth Amendment grounds.

[2] The State cross-examined Hart about the content of the texts on Hargrove's phone:

[STATE]: So King of Hearts, what does that mean?
[HART]: It's just a pet name we call each other, because my last name is Hart, and she's the queen of my heart.
. . . .
[STATE]: And you've set up your phone so that that would be the salutation on all your text messages?
[HART]: Correct.
[STATE]: So that text message is from your phone?
[HART]: Yeah, possibly.
[STATE]: I'm handing you [exhibit] 26. Did you send that text?
[HART]: Again, I'm not sure.
[STATE]: But it also has the King of Hearts salutation, right?

relationship with Hargrove; and (3) admissions that the texts "could be taken" as "highly threatening," that he was "not joking" when he sent them, and that he had been taking "a lot of medication" and was drinking at the time. RP (Jan. 11, 2012, afternoon) at 65-68. The trial court admitted the content of at least one of the texts, exhibit 19.

¶8 In its closing argument to the jury, the State noted Hart's cross-examination admission that he had sent the text messages. The jury convicted Hart on both the assault and the harassment counts.

¶9 At sentencing, Hart's counsel stated that although initially he had been concerned that Hart had potential mental health issues,

> things didn't go in that direction because at the same time there was never really any question in my mind as to Mr. Hart's competency to assist in his defense. So that's just not the way the defense strategy went in this case. I do still have concerns about that, but I've spoken with my client and with his mother, and I'm not aware of any actual diagnosis that has been made.

RP (Jan. 30, 2012) at 74-75. The trial court sentenced Hart to 4 months of confinement for the assault conviction, with an additional consecutive 36 months for the firearm enhancement, and 365 days for the harassment conviction to run concurrently with the 40-month enhanced assault sentence. Hart appeals both convictions and the firearm sentencing enhancement for the assault.

---

[HART]: Correct.

. . . .

[STATE]: Handing you [Exhibit] 25, did you send that?

[HART]: Yeah, I probably did.

RP (Jan. 11, 2012, afternoon) at 65-66.

ANALYSIS

SCOPE OF CROSS-EXAMINATION; REVERSAL OF HARASSMENT
CONVICTION

¶10 Hart argues that (1) the trial court erred when it permitted the State to cross-examine him about his texts to Hargrove because this topic was outside the scope of his direct examination; and (2) this error constitutes grounds for reversal because it violated his right against self-incrimination under the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution. *Malloy v. Hogan*, 378 U.S. 1, 3, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). The State counters that (1) the trial court was acting within its discretion when it permitted cross-examination into additional matters outside the scope of Hart's direct examination; (2) Hart's threatening text messages to Hargrove were relevant to disprove Hart's claim that he did not know the purpose of the police visit to his house, which precipitated the assault charge; and (3) any error was harmless. We hold that this extended cross-examination of Hart was constitutional error and that it was not harmless beyond a reasonable doubt.[3]

A. Standard of Review

¶11 We review a trial court's ruling on the scope of cross-examination for abuse of discretion. *State v. Berlin*, 167 Wn. App. 113, 127, 271 P.3d 400 (citing *State v. Fisher*, 165 Wn.2d 727, 752, 202 P.3d 937 (2009)), *review denied*, 174 Wn.2d 1009 (2012). A court necessarily abuses its discretion if it denies an accused his constitutional rights.

---

[3] The State does not argue that Hart's failure to object to his cross-examination on Fifth Amendment grounds should bar our consideration of this issue under RAP 2.5(a). Instead, the State addresses Hart's Fifth Amendment argument on the merits, and so do we.

*State v. Iniguez,* 167 Wn.2d 273, 280, 217 P.3d 768 (2009) (quoting *State v. Perez,* 137 Wn. App. 97, 105, 151 P.3d 249 (2007)). Whether a defendant irrevocably waived his Fifth Amendment privilege not to be a witness against himself by testifying on his own behalf is a question of law we review de novo. *State v. Epefanio,* 156 Wn. App. 378, 388, 234 P.3d 253 (citing *State v. Bankes,* 114 Wn. App. 280, 287, 57 P.3d 284 (2002)), *review denied,* 170 Wn.2d 1011 (2010); *Iniguez,* 167 Wn.2d at 280.

■ ¶12 It is a basic tenet of our system of justice that "[n]o person shall be compelled in any case to give evidence against himself." WASH. CONST. art. I, § 9; *see also* U.S. CONST. amend. V. Nevertheless, " 'when an accused voluntarily takes the stand he waives his constitutional rights [against self-incrimination] as to all matters concerning which cross-examination is otherwise normally proper.' " *State v. Robideau,* 70 Wn.2d 994, 1001, 425 P.2d 880 (1967) (quoting *Jones v. United States,* 111 U.S. App. D.C. 276, 296 F.2d 398, 404 (1961)). But such waiver extends "only to cross-examination which . . . is *limited to the scope of the defendant's direct testimony." Epefanio,* 156 Wn. App. at 388 (emphasis added) (citing *Robideau,* 70 Wn.2d at 1001).

¶13 Hart's testimony on direct examination was limited to the facts underlying the assault charge. But over his objection, the trial court allowed the State to cross-examine Hart about his text messages to Hargrove, the subject of his separate harassment charge. Washington Evidence Rule 611(b), which governs cross-examination of witnesses at trial, provides, "Cross examination should be *limited to the subject matter of the direct examination* and matters affecting the credibility of the witness." (Emphasis added.) In our view, the State's attempt to relate its questions about the text messages to the assault charge is too attenuated to justify the trial court's expansion of cross-examination.

■ ■ ¶14 On the contrary, it appears from the record that Hart chose to exercise his constitutional right to

remain silent about the harassment charge and, therefore, strategically refrained from addressing the text messages during direct examination. Historically, the purpose of the accused's constitutional right to remain silent has been to protect him or her "from compulsory incrimination through his own testimony or personal records." *State v. Johnston*, 27 Wn. App. 73, 75, 615 P.2d 534 (1980) (citing *Bellis v. United States*, 417 U.S. 85, 88, 94 S. Ct. 2179, 40 L. Ed. 2d 678 (1974)). We disagree with the State's claim that the text messages were relevant to the assault charge (to show Hart's state of mind when police arrived), because Hart's intent was not relevant to prove second degree assault, charged as having been committed "with a deadly weapon." RCW 9A.36.021(1)(c). We hold that the trial court thwarted Hart's exercise of his constitutional right against self-incrimination on the harassment charge when it allowed the State's expanded cross-examination to elicit the harassing content of Hart's text messages and his admission that he had sent them to Hargrove.

## B. Error not Harmless

¶15 Both our state and federal constitutions prohibit the State from using a defendant's right to remain silent to prove the State's case. U.S. Const. amend. V; Wash. Const. art. I, § 9; *see also Malloy*, 378 U.S. at 3. Error arising from a Fifth Amendment violation is a constitutional error, which we presume to be prejudicial; we will affirm only if the State shows that the error was harmless beyond a reasonable doubt. *State v. Levy*, 156 Wn.2d 709, 732, 132 P.3d 1076 (2006); *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). Constitutional error is harmless if we are "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *Guloy*, 104 Wn.2d at 425. Under the circumstances of this case, we are not persuaded beyond a reasonable doubt that this error was harmless.

¶16 As we have already explained, the State's cross-examination of Hart about a separately charged crime that he did not address during direct examination violated his constitutional right to remain silent; it also impermissibly relieved the State of its burden to prove *all* elements of a charged crime beyond a reasonable doubt. *State v. Vasquez*, 178 Wn.2d 1, 7, 309 P.3d 318 (2013). We acknowledge that, by the time Hart testified on direct, the jury had already heard the State's evidence about the content of his texts, the facts underlying the harassment charge, and Hargrove's denial that she felt threatened by these texts or was concerned that Hart would harm her.[4] And the State's only evidence of the critical "threat" element of the harassment charge[5] was Blodgett's testimony that Hargrove "appeared to be concerned over the incident" when she had initially reported the texts. RP (Jan. 11, 2012) at 48. Consequently the State's evidence of this critical harassment element—that the defendant placed "the person threatened in reasonable fear that the threat will be carried out"[6]—was lacking at worst and weak at best before the State cross-examined Hart.

¶17 But the State's cross-examination of Hart about facts underlying the harassment charge bolstered the State's weak case. Hart variably stated that (1) he did not send the texts; (2) he did not remember sending the texts; (3) he had been angry and on medication when he sent the texts; and (4) although the texts "could be taken" as "highly threatening" and he had not been joking when he sent

---

[4] The State had even attempted to impeach Hargrove with her prior inconsistent statements to the police when she appeared to recant them during trial.

[5] RCW 9A.46.020(1) provides that "[a] person is guilty of harassment if:

(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; . . . and
(b) *The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.*

(Emphasis added.)

[6] RCW 9A.46.020(1)(b).

them, Hargrove knew he would never hurt her. RP (Jan. 11, 2012, afternoon) at 67. And in closing argument, the State used Hart's cross-examination "admi[ssions] that [the] text messages were from him" and that he had sent them "knowingly." RP (Jan. 12, 2012) at 69. Accordingly, we reverse Hart's harassment conviction.

¶18 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

WORSWICK, C.J., and JOHANSON, J., concur.