FILED
COURT OF APPEALS
DIVISION II

2014 MAR 25 AM 8:48

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43108-4-II |
| Respondent, | |
| v. | |
| BRYAN L. HART, | PUBLISHED IN PART OPINION |
| Appellant. | |

HUNT, J. — Bryan Hart appeals his jury convictions for second degree assault and misdemeanor harassment (domestic violence); he also appeals the firearm sentencing enhancement on his assault conviction. He argues that (1) because the trial court erroneously allowed the State to cross-examine him about topics that violated his Fifth Amendment rights, his harassment conviction violated his right to free speech; (2) the trial court violated his right to a public trial when it met with counsel twice in camera to discuss jury instructions; (3) the evidence was insufficient to support his firearm sentencing enhancement special verdict and his second degree assault conviction; (4) the trial court erred when it failed to instruct the jury about definitions relating to the firearm enhancement and the harassment charge; and (5) he received ineffective assistance when his counsel failed to make certain evidentiary objections and failed to raise a mental health defense. Holding that the State fails to overcome the prejudice presumed

from its unconstitutional cross-examination of Hart, we reverse his harassment conviction, but we affirm Hart's second degree assault conviction and firearm sentencing enhancement.

FACTS

I. CRIMES

Jennifer Hargrove reported to Hoquiam Police Department Officer Cody Blodgett "concern" that her ex-boyfriend, Hart, had sent her several threatening text messages that evening. Report of Proceedings (RP) (Jan. 11, 2012) at 49. These text messages included the following statements:

> You should leave town today, right f*ck now before I find you. . . . You will learn respect if you learn nothing else from me. . . . No, you or him don't understand respect. I'm fine being in prison. It's my destiny. . . . If my d*ck is f*cked up, you're—you're next, stripper whore. . . . Don't worry, slut. I'm going to f*ck you up and him. No, this is what I was born to do. I kill people. I'm tired of your lies. This is what I was born for.

RP (Jan. 11, 2012) at 40-42. The police decided to contact Hart.

Because of a previous firearm incident at Hart's residence, the police suspected that he might again have a firearm. Blodgett arrived at Hart's house at 3:00 the morning after Hargrove's report, accompanied by four other uniformed officers positioned in a perimeter around the residence. Blodgett knocked on the door, announced that he was with the Hoquiam Police Department, and addressed Hart by his first name. Hart opened the door, acknowledged the officer's presence, and shut the door. Minutes later, the front door opened again and Hart walked out with a small black pistol in his hand, scanning the area. Blodgett ordered Hart to drop the gun. Hart aimed the gun in the officers' direction, abruptly retreated back into the house, and slammed the door. The police negotiated with Hart without further confrontation

until around 10:45 a.m., when they finally persuaded him to leave his residence and arrested him. Inside Hart's residence, the police found a Glock 17 9 mm handgun lying on the couch next to Hart's front door, two fully loaded magazines for the firearm on the floor, and "a couple of bullets loose on the floor." RP (Jan. 11, 2012, afternoon) at 45.

## II. PROCEDURE

The State charged Hart with second degree assault with a firearm enhancement and misdemeanor harassment (domestic violence). At the jury trial, the officers testified to the facts previously described. Sergeant Shane Krohn further testified that Hart's handgun, seized from his home, "looks to be in very working order," and that it did not "look to be damaged or anything." RP (Jan. 11, 2012, afternoon) at 43. Hart did not object to the State's offer of the gun or the magazines into evidence.

Hargrove testified that Hart had sent her the text messages but that she had not been concerned for her safety or the safety of others; rather, she "was more concerned about how he was feeling." RP (Jan. 11, 2012) at 43. When the State asked if Hart had "ever done anything in [her] presence to make [her] believe that he would carry out these threats" in the texts, she responded, "No." RP (Jan. 11, 2012) at 45. She also confirmed that she had written and signed a police statement under penalty of perjury that "I never felt I was ever in any danger and still don't." RP (Jan. 11, 2012, afternoon) at 51.

On direct examination, Hart testified about his interactions with the police and about the assault charge; he did not, however, testify about the texts he had allegedly sent to Hargrove. When the State attempted to cross-examine Hart about the content of these text messages, he

objected that these questions went beyond the scope of his direct examination.[1] The trial court overruled the objection.

The State then cross-examined Hart with repeated pointed questions about the texts and other personal subjects, forcing Hart to divulge specific incriminating information: The State elicited from Hart (1) that he "probably" or "might have" sent the texts, but was not certain; (2) details about the meaning of the texts[2] and about his relationship with Hargrove; and (3) admissions that the texts "could be taken" as "highly threatening," that he was "not joking" when he sent them, and that he had been taking "a lot of medication" and was drinking at the time. RP (Jan. 11, 2012, afternoon) at 65-68. The trial court admitted the content of at least one of the texts, exhibit 19.

---

[1] Hart did not object on Fifth Amendment grounds.

[2] The State cross-examined Hart about the content of the texts on Hargrove's phone:
> [STATE]: So King of Hearts, what does that mean?
> [HART]: It's just a pet name we call each other, because my last name is Hart, and she's the queen of my heart.
>
> . . . .
>
> [STATE]: And you've set up your phone so that that would be the salutation on all your text messages?
> [HART]: Correct.
> [STATE]: So that text message is from your phone?
> [HART]: Yeah, possibly.
> [STATE]: I'm handing you [exhibit] 26. Did you send that text?
> [HART]: Again, I'm not sure.
> [STATE]: But it also has the King of Hearts salutation, right?
> [HART]: Correct.
>
> . . . .
>
> [STATE]: Handing you [Exhibit] 25, did you send that?
> [HART]: Yeah, I probably did.

RP (Jan. 11, 2012, afternoon) at 65-66.

In its closing argument to the jury, the State noted Hart's cross-examination admission that he had sent the text messages. The jury convicted Hart on both the assault and the harassment counts.

At sentencing, Hart's counsel stated that although initially he had been concerned that Hart had potential mental health issues,

> things didn't go in that direction because at the same time there was never really any question in my mind as to Mr. Hart's competency to assist in his defense. So that's just not the way the defense strategy went in this case. I do still have concerns about that, but I've spoken with my client and with his mother, and I'm not aware of any actual diagnosis that has been made.

RP (Jan. 30, 2012) at 74-75. The trial court sentenced Hart to 4 months of confinement for the assault conviction, with an additional consecutive 36 months for the firearm enhancement, and 365 days for the harassment conviction to run concurrently with the 40-month enhanced assault sentence. Hart appeals both convictions and the firearm sentencing enhancement for the assault.

## ANALYSIS

### I. SCOPE OF CROSS-EXAMINATION; REVERSAL OF HARASSMENT CONVICTION

Hart argues that (1) the trial court erred when it permitted the State to cross-examine him about his texts to Hargrove because this topic was outside the scope of his direct examination; and (2) this error constitutes grounds for reversal because it violated his right against self-incrimination under the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *Malloy v. Hogan*, 378 U.S. 1, 3, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). The State counters that (1) the trial court was acting within its discretion when it permitted cross-examination into additional matters outside the scope of Hart's direct examination; (2) Hart's threatening text

messages to Hargrove were relevant to disprove Hart's claim that he did not know the purpose of the police visit to his house, which precipitated the assault charge; and (3) any error was harmless. We hold that this extended cross-examination of Hart was constitutional error and that it was not harmless beyond a reasonable doubt.[3]

A. Standard of Review

We review a trial court's ruling on the scope of cross-examination for abuse of discretion. *State v. Berlin*, 167 Wn. App. 113, 127, 271 P.3d 400 (citing *State v. Fisher*, 165 Wn.2d 727, 752, 202 P.3d 937 (2009)), *review denied*, 174 Wn.2d 1009 (2012). A court necessarily abuses its discretion if it denies an accused his constitutional rights. *State v. Iniguez*, 167 Wn.2d 273, 280, 217 P.3d 768 (2009) (quoting *State v. Perez*, 137 Wn. App. 97, 105, 151 P.3d 249 (2007)). Whether a defendant irrevocably waived his Fifth Amendment privilege not to be a witness against himself by testifying on his own behalf is a question of law, we review de novo. *State v. Epefanio*, 156 Wn. App. 378, 388, 234 P.3d 253 (citing *State v. Bankes*, 114 Wn. App. 280, 287, 57 P.3d 284 (2002)), *review denied*, 170 Wn.2d 1011 (2010); *Iniguez*, 167 Wn.2d at 280.

It is a basic tenet of our system of justice that "[n]o person shall be compelled in any case to give evidence against himself." WASH. CONST. art. I, § 9; *see also* U.S. CONST. amend. V. Nevertheless, "'when an accused voluntarily takes the stand he waives his constitutional rights [against self-incrimination] as to all matters concerning which cross-examination is otherwise

---

[3] The State does not argue that Hart's failure to object to his cross-examination on Fifth Amendment grounds should bar our consideration of this issue under RAP 2.5(a). Instead, the State addresses Hart's Fifth Amendment argument on the merits, and so do we.

normally proper.'" *State v. Robideau*, 70 Wn.2d 994, 1001, 425 P.2d 880 (1967) (quoting *Jones v. United States*, 296 F.2d 398, 404 (1961)). But such waiver extends "only to cross-examination which . . . is *limited to the scope of the defendant's direct testimony*." *Epefanio*, 156 Wn. App. at 388 (citing *Robideau*, 70 Wn.2d at 1001) (emphasis added).

Hart's testimony on direct examination was limited to the facts underlying the assault charge. But over his objection, the trial court allowed the State to cross-examine Hart about his text messages to Hargrove, the subject of his separate harassment charge. Washington Evidence Rule (ER) 611(b), which governs cross-examination of witnesses at trial, provides, "Cross examination should be *limited to the subject matter of the direct examination* and matters affecting the credibility of the witness." (Emphasis added.) In our view, the State's attempt to relate its questions about the text messages to the assault charge is too attenuated to justify the trial court's expansion of cross-examination.

On the contrary, it appears from the record that Hart chose to exercise his constitutional right to remain silent about the harassment charge and, therefore, strategically refrained from addressing the text messages during direct examination. Historically, the purpose of the accused's constitutional right to remain silent has been to protect him or her "from compulsory incrimination through his own testimony or personal records." *State v. Johnston*, 27 Wn. App. 73, 75, 615 P.2d 534 (1980) (citing *Bellis v. United States*, 417 U.S. 85, 88, 94 S. Ct. 2179, 40 L. Ed. 2d 678 (1974)). We disagree with the State's claim that the text messages were relevant to the assault charge (to show Hart's state of mind when police arrived), because Hart's intent was not relevant to prove second degree assault, charged as having been committed "with a deadly weapon." RCW 9A.36.021(1)(c). We hold that the trial court thwarted Hart's exercise of his

constitutional right against self-incrimination on the harassment charge when it allowed the State's expanded cross-examination to elicit the harassing content of Hart's text messages and his admission that he had sent them to Hargrove.

### B. Error not Harmless

Both our state and federal constitutions prohibit the State from using a defendant's right to remain silent to prove the State's case. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *see also Malloy*, 378 U.S. at 3. Error arising from a Fifth Amendment violation is a constitutional error, which we presume to be prejudicial; we will affirm only if the State shows that the error was harmless beyond a reasonable doubt. *State v. Levy*, 156 Wn.2d 709, 732, 132 P.3d 1076 (2006); *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied, Guloy v. Washington*, 475 U.S. 1020, 106 S. Ct. 1208, 89 L. Ed. 2d. 321 (1986). Constitutional error is harmless if we are "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *Guloy*, 104 Wn.2d at 425. Under the circumstances of this case, we are not persuaded beyond a reasonable doubt that this error was harmless.

As we have already explained, the State's cross-examination of Hart about a separately charged crime that he did not address during direct examination violated his constitutional right to remain silent; it also impermissibly relieved the State of its burden to prove *all* elements of a charged crime beyond a reasonable doubt. *State v. Vasquez*, 178 Wn.2d 1, 7, 309 P.3d 318 (2013). We acknowledge that, by the time Hart testified on direct, the jury had already heard the State's evidence about the content of his texts, the facts underlying the harassment charge, and Hargrove's denial that she felt threatened by these texts or was concerned that Hart would harm

her.[4] And the State's only evidence of the critical "threat" element of the harassment charge[5] was Blodgett's testimony that Hargrove "appeared to be concerned over the incident" when she had initially reported the texts. RP (Jan. 11, 2012) at 48. Consequently the State's evidence of this critical harassment element—that the defendant placed "the person threatened in reasonable fear that the threat will be carried out"[6]—was lacking at worst and weak at best before the State cross-examined Hart.

But the State's cross-examination of Hart about facts underlying the harassment charge bolstered the State's weak case. Hart variably stated that (1) he did not send the texts; (2) he did not remember sending the texts; (3) he had been angry and on medication when he sent the texts; and (4) although the texts "could be taken" as "highly threatening" and he had not been joking when he sent them, Hargrove knew he would never hurt her. RP (Jan. 11, 2012, afternoon) at 67. And in closing argument, the State used Hart's cross-examination "admi[ssions] that [the] text messages were from him" and that he had sent them "knowingly." RP (Jan. 12, 2012) at 69. Accordingly, we reverse Hart's harassment conviction.

---

[4] The State had even attempted to impeach Hargrove with her prior inconsistent statements to the police when she appeared to recant them during trial.

[5] RCW 9A.46.020(1) provides that "[a] person is guilty of harassment if:
(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; . . . and
(b) *The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.*
(Emphasis added.)

[6] RCW 9A.46.020(1)(b).

No. 43108-4-II

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

ADDITIONAL FACTS

After the close of evidence, the trial court announced it would assemble the jury instructions, excused the jury, and directed counsel to appear in chambers for "a formal discussion regarding jury instructions, *what format we intend to use*." RP (Jan. 11, 2012) at 70 (emphasis added). After this recess, with counsel present in the courtroom, the trial court stated:

> Now, gentlemen, I've given you and I've been editing in the back . . . a very rough draft of proposed jury instructions. I had hoped we could get this to the jury today, but I now have another instruction submitted, and I don't think we're going to get to the jury today.
>
> . . . .
>
> [U]nless we have something further, I'm going to go back and go to work on the jury instructions. So if you gentlemen want to take a look at what you've got, I'll see you . . . tomorrow morning.

RP (Jan. 11, 2012) at 71-72. The next morning, outside the jury's presence, the trial court asked counsel whether they had any exceptions to "the proposed instruction that [the court] intend[ed to] giv[e] to the jury." RP (Jan. 12, 2012) at 61. Both counsel responded that they did not.

The trial court gave the following "to convict" jury instruction (14) for the harassment charge:

> To convict the [sic] Bryan Hart of the crime of harassment, each of the following five elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about October 4, 2011, Mr. Bryan Hart knowingly threatened to cause bodily injury immediately or in the future to Jennifer Hargrove, or
> (2) That the words or conduct of Bryan Hart placed Jennifer Hargrove in reasonable fear that the threat would be carried out;
> (3) That Bryan Hart knew that his words or conduct would place Jennifer Hargrove in reasonable fear that the threat to kill would be carried out;

(4) That Mr. Hart acted without lawful authority; and

(5) That the threat was made or received in the State of Washington.

Supplemental Clerk's Papers at 20.

## I. PUBLIC TRIAL

Hart argues that the trial court violated his right and the public's right to an open trial when the trial court met with counsel in camera to discuss the jury instructions without first making the required *Bone-Club*[7] findings. Because Hart fails to show that these jury instruction discussions were subject to the public trial right, his argument fails.

Before determining whether the trial court violated Hart's constitutional right to a public trial, we "first consider whether the proceeding at issue implicates the public trial right, thereby constituting a closure at all." *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). We determine "whether the public trial right attaches to a particular proceeding" by applying the "experience and logic test" the United States Supreme Court formulated in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-10, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (*Press* II), to determine whether the proceeding at issue here "implicate[d] the core values the public trial right serves." *Sublett*, 176 Wn.2d at 72-73.

> The first part of the test, the experience prong, asks "whether the place and process have historically been open to the press and general public." The logic prong asks "whether public access plays a significant positive role in the functioning of the particular process in question." If the answer to *both* is *yes*, the public trial right attaches and [the trial court must consider] the *Waller* or *Bone-Club* factors . . . before the proceeding may be closed to the public.

---

[7] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

*Sublett*, 176 Wn.2d at 73 (discussing *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984), and *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995)) (emphasis added) (footnote and citations omitted) (quoting *Press* II, 478 U.S. at 7-8).

Applying both prongs of this experience and logic test in *Sublett*, our Supreme Court has ruled that a jury's question about an instruction was "similar in nature to proceedings regarding jury instructions in general" and that "[h]istorically, such proceedings have not necessarily been conducted in an open courtroom."[8] *Sublett*, 176 Wn.2d at 75. Here, Hart has not shown that the trial court's in camera discussion of the jury instructions' "format" was the type of proceeding historically conducted in open public court, or that public access would have played a "'significant positive role'" in this particular proceeding. *Sublett*, 176 Wn.2d at 73 (quoting *Press* II, 478 U.S. at 8). Nor are we independently aware of any such authority. On the contrary, applying the "experience and logic test," *Press* II, 478 U.S. at 9, we hold that Hart fails to show that the trial court violated his right or the public's right to an open and public trial.

---

[8] The court continued:

> Jury instructions are covered by CrR 6.15. Proposed instructions are submitted in writing at least three days before the start of trial. CrR 6.15(a). We are aware that, quite often, counsel discuss the instructions with the court during an informal proceeding. But before instructing the jury, counsel is to be given the opportunity to object in the absence of the jury. CrR 6.15(c). Any objections to the instructions, as well as the grounds for the objections, must be put in the record to preserve review.

*Sublett*, 176 Wn.2d at 75-76 (citing *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 162-63, 795 P.2d 1143 (1990); *Goehle v. Fred Hutchinson Cancer Research Ctr.*, 100 Wn. App. 609, 615-17, 1 P.2d 579 (2000)).

## II. FIREARM

### A. Sufficiency of Operability Evidence

Hart next argues that the State failed to prove that the firearm he used was operable for purposes of supporting both his second degree assault conviction and his firearm sentencing enhancement. These arguments fail.

#### 1. Second degree assault—with firearm

Because Hart's second degree assault conviction was based on a threat with a handgun, the State did not need to prove that the handgun was operable; instead, the State needed to prove only that Hart used a handgun to threaten another. *In re Pers. Restraint of Rivera*, 152 Wn. App. 794, 803, 218 P.3d 638 (2009), *aff'd by In re Pers. Restraint of Jackson*, 175 Wn.2d 155, 283 P.3d 1089 (2012). Viewing the evidence in the light most favorable to the State, we hold that it was sufficient for a rational trier of fact to find the essential elements of second degree assault proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972)).

#### 2. Firearm sentencing enhancement

Hart similarly argues that the State failed to prove that the firearm he used was operable for purposes of his firearm sentencing enhancement. But Hart never objected or disputed at trial that the firearm he used was operable. Moreover, he testified that he answered the door while holding the gun, from which the jury could infer the firearm's operability. *State v. Kruger*, 116 Wn. App. 685, 690, 67 P.3d 1147 (citing *State v. Lawson*, 37 Wn. App. 539, 543, 681 P.2d 867 (1984)), *review denied*, 150 Wn.2d 1024 (2003). In addition, Krohn testified that while

searching Hart's residence, the police found a Glock 17 9 mm handgun lying on the couch next to Hart's front door, two fully loaded magazines for the firearm, and "a couple of bullets loose on the floor." RP (Jan. 11, 2012, afternoon) at 45. Again, the jury could infer the firearm's operability from these facts. Krohn further stated that the gun appeared operable, that it "look[ed] to be in very working order," and that it did not "look to be damaged or anything." RP (Jan. 11, 2012, afternoon) at 43. We hold that there was sufficient evidence for a rational trier of fact to conclude that Hart displayed an operable firearm.

## B. Jury Instructions

Hart also argues that the trial court improperly relieved the State of its burden of proving the firearm enhancement because the court did not provide the jury with an appropriate instruction for finding that Hart was armed with a firearm.[9] Again, Hart did not object below to the absence of a jury instruction defining "armed" or "firearm"; nor did he ask the trial court to include definitions for these terms. Because Hart failed to preserve this alleged error for appeal, he must meet the RAP 2.5(a)(3) manifest constitutional error exception in order for us to consider this issue for the first time on appeal. In this Hart also fails.[10]

---

[9] Hart also challenges the adequacy of the jury instructions for the harassment charge. Because we reverse his harassment conviction based on the State's unconstitutional cross-examination, we do not address this instruction challenge. For the same reason, we do not reach Hart's First Amendment challenge to his harassment conviction.

[10] Hart argues that the trial court's failure to submit an instruction on these definitions to the jury was a constitutional error, which he may challenge for the first time on appeal. *State v. Scott*, 110 Wn.2d 682, 684, 757 P.2d 492 (1988) (citing RAP 2.5(a)(3)). But as our Supreme Court has previously explained, this narrow "constitutional error exception is not intended to afford criminal defendants a means for obtaining new trials whenever they can 'identify a constitutional issue not litigated below.'" *Scott*, 110 Wn.2d at 687 (quoting *State v. Valladares*, 31 Wn. App. 63, 76, 639 P.2d 813 (1982), *affirmed in part and reversed in part*, 99 Wn.2d 663 (1983)).

Merely characterizing an issue as being of constitutional magnitude does not show that the alleged error "is truly of constitutional magnitude." *See, e.g., State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988). The trial court need instruct the jury only as to each element of the charged offense; its failure to "'define further one of those elements is not within the ambit of the constitutional rule.'" *Scott*, 110 Wn.2d at 689 (quoting *State v. Ng*, 110 Wn.2d 32, 44, 750 P.2d 632 (1988) (quoting *State v. Pawling*, 23 Wn. App. 226, 597 P.2d 1367, *review denied*, 92 Wn.2d 1035 (1979)). Moreover, the terms "armed" and "firearm" have common meanings, which the jury could readily apply to the elements of a firearm enhancement special verdict. *See Scott*, 110 Wn.2d at 692.[11] Because this claimed error was not of constitutional magnitude, we do not further consider it.[12]

### III. Effective Assistance of Counsel

Finally, Hart argues that he received ineffective assistance when his defense counsel (1) failed to seek a limiting instruction or to object to police officer testimony about an interview with Hargrove, and (2) failed to call experts to investigate Hart's mental health. Hart's argument fails.

---

[11] *State v. Eckenrode*, 159 Wn.2d 488, 494, 150 P.3d 1116 (2007) (evidence sufficient to uphold verdict despite court's failure to define "armed," "[a]s long as any rational trier of fact could have found that [the defendant] was armed").

[12] Even if we would have considered it error for the trial court not to instruct on the definitions, such error would have been harmless because any rational juror would find beyond a reasonable doubt that Hart was armed with an operable 9 mm handgun during the crime. Moreover, in Hart's own statement to police on October 6, 2011, he admitted to aiming his handgun out the door at two officers.

Our "scrutiny of defense counsel's performance is highly deferential and employs a strong presumption of reasonableness." *State v. Humphries*, 170 Wn. App. 777, 797, 285 P.3d 917 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 335-36, 899 P.2d 1251 (1995)), *review granted*, 177 Wn.2d 1007 (2013). An appellant claiming ineffective assistance of counsel must show, first, that counsel's performance fell below an objective standard of reasonableness, and second, "a reasonable probability that the outcome of the trial would have been different absent counsel's deficient performance." *Humphries*, 170 Wn. App. at 797 (citing *Strickland*, 466 U.S. at 694; *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987)). Failure to meet either prong of this test defeats a showing of ineffective assistance of counsel. *Humphries*, 170 Wn. App. at 797 (citing *Strickland*, 466 U.S. at 697). "If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective assistance of counsel." *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002) (citing *State v. Adams*, 91 Wn.2d 86, 90, 586 P.2d 1168 (1978)).

A. Failure To Request Limiting Instruction and To Object to Hearsay Testimony

Here, defense counsel's decision not to object to and not to request a limiting instruction for Blodgett's testimony could have been legitimate trial strategy to avoid reemphasizing damaging evidence that Hart sent threatening texts and that Hargrove had expressed concern about the incident to Blodgett. Relative to his concern about reemphasizing negative facts, counsel may also have believed that such an objection and limiting instruction would have

produced little if any benefit[13] for Hart's case in light of the texts' contents having already been admitted into evidence. We hold that defense counsel's conduct did not fall below an objective standard of reasonableness. Because Hart fails to meet the deficient performance prong of the ineffective assistance of counsel test, we do not address the prejudice prong.[14]

### B. Failure To Pursue Mental Health Defense

Hart also contends that his defense counsel should have investigated Hart's mental health, either to raise a defense at trial or to present a mitigating factor at sentencing. But Hart points to no evidence in the record before us on appeal that he had mental health issues that would have affected his competence to stand trial or his sentence. On the contrary, during the sentencing hearing, Hart's counsel stated that he had decided not to pursue a mental health defense because "there was never really any question in my mind as to Mr. Hart's competency to assist in his defense. So that's just not the way the defense strategy went in this case." RP (Jan. 30, 2012) at 74. This comment shows that, as a matter of deliberate trial strategy, defense counsel had considered and rejected a diminished capacity defense, primarily because there was

---

[13] Although Hart now contends that Blodgett's testimony about Hargrove's statements was inadmissible hearsay, the officer's testimony that Hargrove "appeared [to him] to be concerned over the incident" would arguably have been admissible under the ER 803 hearsay exception as a "statement of the declarant's then existing state of mind." ER 803(a)(3). *See Humphries*, 170 Wn. App. at 797; *see also State v. Dow*, 162 Wn. App. 324, 335-37, 253 P.3d 476 (2011) (failure to request limiting instruction was legitimate trial tactic); *State v. Yarbrough*, 151 Wn. App. 66, 90-91, 210 P.3d 1029 (2009) (same); *State v. Price*, 126 Wn. App. 617, 649, 109 P.3d 27, *review denied*, 155 Wn.2d 1018 (2005); *State v. Barragan*, 102 Wn. App. 754, 762, 9 P.3d 942 (2000); *State v. Donald*, 68 Wn. App. 543, 551, 844 P.2d 447, *review denied*, 121 Wn.2d 1024 (1993).

[14] We also note that because we reverse Hart's harassment conviction on other grounds, this portion of Hart's ineffective assistance challenge does not affect our holding.

insufficient evidence that Hart had a diminished mental capacity.[15]   Again, Hart does not overcome the strong presumption that defense counsel's conduct was not deficient. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004) (citing *McFarland*, 127 Wn.2d at 335). Accordingly, Hart's claim of ineffective assistance of counsel fails.

We affirm Hart's second degree assault conviction and firearm sentencing enhancement, but we reverse his harassment conviction.

Hunt, J.

We concur:

Worswick, C.J.

Johanson, J.

---

[15] *See State v. McCreven*, 170 Wn. App. 444, 483-84, 284 P.3d 793 (2012), *review denied*, 176 Wn.2d 1015 (2013) (rejecting defendant's claim that counsel failed to investigate his mental health where counsel testified that he never had concerns about his client's competence to stand trial).