# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54455-5-II |
| Respondent, | |
| v. | |
| DAMDEE SOUNGPANYA, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Damdee Soungpanya encountered CH, who was a stranger to him, at a bus stop. He had sexual intercourse with her in a nearby field. He was charged with second degree rape of a person who was incapable of consent or by forcible compulsion. CH testified that she was intoxicated at the time of the assault, did not consent, and sustained physical injuries from the assault. Soungpanya testified that CH did not seem intoxicated and the intercourse was consensual. The jury convicted Soungpanya as charged.

Soungpanya appeals his conviction, arguing that he received ineffective assistance of counsel because his lawyer should have requested an instruction that the jury could acquit if it found by a preponderance of the evidence that Soungpanya reasonably believed CH was not incapacitated. Soungpanya also asserts that prosecutorial misconduct requires reversal. Soungpanya asks this court to remand for resentencing under *State v. Blake*,[1] he challenges two community custody conditions on constitutional grounds, and he asks this court to remand to strike

---

[1] 197 Wn.2d 170, 481 P.3d 521 (2021).

his community custody supervision fees. Finally, Soungpanya raises other arguments for reversal in a statement of additional grounds for review (SAG).

We affirm Soungpanya's conviction. The State concedes that Soungpanya should be resentenced under *Blake* and that the community custody conditions are improper. We accept the State's concessions and remand for resentencing and modification of the community custody conditions. On remand, the trial court should also strike the supervision fee. None of the arguments in Soungpanya's SAG merits reversal.

FACTS

A.      Background

In February 2017, 27-year-old CH was temporarily staying with her stepmother and father in Vancouver, Washington. CH had an alcohol addiction and was trying to stop drinking.

One day, CH purchased some alcohol and started drinking in the store bathroom. She testified that she continued to drink when she left the store and may have had more to drink while on the bus. She did not want to go straight home because her parents "wouldn't have been happy" about her drinking. Verbatim Report of Proceedings (VRP) (Dec. 2, 2019) at 214. CH rode the bus around Vancouver. At some point after dark, CH got off the bus near her parents' apartment and began walking home.

B.      Assault

CH testified that she was pushed from behind while walking past a field near the bus stop. No one spoke to her and she did not see the person who pushed her. She did not consent to have intercourse with anyone. CH had no memory of what happened after she was pushed down. She next recalled being in her parents' apartment, crying on the kitchen floor.

SH, CH's stepmother, testified that CH arrived home sometime after 8:00 p.m. CH's clothes were dirty and muddy, her body scratched, and her face bloody. CH said she had fallen down. SH could tell CH had been drinking. After CH took a shower, SH saw her "curled up on the floor in the kitchen sobbing." *Id*. at 161.

CH told SH she had been raped. SH called 911, and the operator told her to bring CH to the hospital for a sexual assault examination.

C.     Sexual Assault Examination

Holly Musser of the Vancouver Police Department met CH at the hospital. Musser detected the smell of alcohol on CH's breath but said it "wasn't overpowering." *Id*. at 190. Brigitte Montgomery, a sexual assault nurse examiner, examined CH. Montgomery's notes indicate that CH said she had "a lot of drinks" the day of the assault. VRP (Dec. 3, 2019) at 279. CH said her last recollection before blacking out was walking on the sidewalk to her parents' apartment and her next recall was being in her parents' kitchen with "a bloody face, dirty clothes," soreness in her vaginal area, and missing her backpack, phone, and wallet. *Id*.

According to Montgomery, at the time of the exam, CH did not appear "actively intoxicated" because she "wasn't weaving or slurring her words." *Id*. at 296. Montgomery examined CH, collected swabs from various parts of her body for DNA testing, and took a urine sample. Montgomery documented that CH had vaginal pain and tenderness and bruising all over her body. CH also had multiple fresh abrasions on her face. Montgomery testified these injuries were consistent with falling on a sidewalk or other textured surface.

3

D.    Investigation

Musser, who initially investigated the assault, collected DNA reference samples from CH's boyfriend. Musser's colleagues inspected the area near the bus stop where CH said she had been attacked, but law enforcement did not obtain surveillance camera footage from the bus stop.

Asa Louis, a forensic scientist with the Washington State Patrol Crime Laboratory, tested CH's urine sample for alcohol and drugs. The urine sample showed that alcohol, traces of Benadryl, and other medications were present in CH's urine.

Due to backlogs, CH's kit was not fully processed until about a year and a half after the assault. Mariah Coffey, a forensic scientist at the state patrol crime laboratory, found that CH's vaginal swab showed the presence of semen and the DNA of two different individuals, one of whom was responsible for a larger portion of the DNA. The smaller portion was too small to test, so Coffey could not determine whose DNA it was and noted it may have been CH's own DNA. Coffey ruled out CH's boyfriend as a contributor to the larger fraction. Using a national DNA database, Coffey determined that the larger fraction was consistent with Soungpanya's DNA.

The case was assigned to detective Carol Boswell of the Vancouver Police Department. Boswell reached Soungpanya by telephone. Boswell told Soungpanya she was investigating an assault that occurred in Vancouver in 2017, but did not specify that it was a sexual assault. Soungpanya denied having been in the area at that time. Boswell then asked Soungpanya "if he was sure that he wasn't [in Vancouver]" because "his DNA was located on a person involved in" the assault. *Id*. at 380. Soungpanya responded that it was not possible for his DNA to be on anyone in Vancouver, and he suggested someone had stolen his identity. Soungpanya then ended the phone call, claiming to be confused and wanting to consult with a lawyer.

Boswell obtained a warrant and collected a reference sample of Soungpanya's DNA. Coffey tested Soungpanya's reference sample and confirmed that it matched the DNA from CH's sexual assault kit swab.

E.     Charging and Pretrial Events

The State charged Soungpanya with second degree rape under both RCW 9A.44.050(1)(a), which prohibits sexual intercourse by forcible compulsion, and RCW 9A.44.050(1)(b), which prohibits intercourse when the victim is incapable of consent because they are mentally incapacitated. Soungpanya was arrested and booked into jail. Soungpanya made phone calls from jail to a friend during which he said, "Some stupid-a** b***h want[ed] to get drunk and go walk around and act stupid." VRP (Dec. 4, 2019) at 516.

On the first day of trial, Soungpanya asked to discharge his counsel and continue the trial. Soungpanya's lawyer read a letter to the court from Soungpanya in which he stated that his lawyer showed a "lack of attention to [his] case" and did not communicate adequately. VRP (Dec. 2, 2019) at 4. Soungpanya said his counsel had failed to "follow up on my investigation or interview witnesses on my case" and complained that a colleague had appeared in his counsel's place at a prior hearing. *Id*. at 4-5.

Defense counsel responded that she had visited Soungpanya in jail to discuss his case, interviewed all but two of the State's witnesses, and provided Soungpanya with transcripts of those interviews. She had not interviewed two of the State's experts due to schedule conflicts. The trial court denied Soungpanya's requests to discharge his attorney and to continue the trial, but instructed the parties to arrange for defense counsel to interview the two expert witnesses before they testified. Counsel interviewed the witnesses the following day.

5

F.    Trial

    1.    State's case

The State's witnesses testified consistent with the facts described above. The State presented evidence that CH was very intoxicated at the time of the assault and incapable of consenting to intercourse. CH testified that she drank several shots of alcohol prior to getting off the bus, was "pretty intoxicated" while walking home, and blacked out after she was pushed down on the sidewalk. *Id.* at 219. Similarly, SH testified that she could tell CH was intoxicated when she arrived home. Musser, the police officer who met CH and her mother at the hospital, testified she smelled alcohol on CH's breath. Louis, the forensic scientist, testified about the alcohol and medications he detected in CH's urine sample. Finally, the State played the tape of a jail phone call for the jury where Soungpanya referred to CH as having been drunk.

There was also testimony from multiple witnesses about CH's injuries, including bruises, abrasions, and injuries to her face, as well as dirt and grass stains on her clothes. CH testified that she had been pushed from behind, but did not recall what happened after that.

    2.    Defense's case

Soungpanya was the only defense witness. He testified that on the day of the encounter with CH, he had traveled to Vancouver by bus to buy a van. When he got off the bus in Vancouver, he saw CH at the bus stop and asked a question about the route. Soungpanya described CH as "shy" and said she did not answer. VRP (Dec. 4, 2019) at 460. Soungpanya got on the next bus but realized he was on the wrong bus and got off at the next stop. He walked back to the original stop, where CH was still waiting.

Soungpanya testified that CH spoke to him when he returned, commenting, "'You came back for me.'" *Id*. at 473. He continued, CH "came onto me. Her body language was showing that she wanted to embrace me. She held out her hand, and . . . I took her hand in my hand and embraced it." *Id*. at 461. CH then put her head on Soungpanya's chest and hugged him. They stood embracing for about five minutes until Soungpanya asked if she "'wanted to go to a more private area.'" *Id*. at 462. Soungpanya said CH responded by saying, "Okay." *Id*. He noted CH did not say no to intercourse with him and "[s]he gave me every indication that she wanted to . . . go to a private area." *Id*. at 473.

Soungpanya said that he went with CH to a grassy embankment near the bus stop. They then had intercourse. Soungpanya said that CH was joking with him and they both enjoyed the encounter. Soungpanya testified that they went back to the bus stop and got on a bus together. Soungpanya said that CH stood up as the bus began to move, causing her to fall into a metal pole and hit her face on the pole and the bus seats.

Soungpanya stated that he did not see CH drinking in his presence, she spoke clearly, and she only stumbled on the bus because it started moving suddenly. He maintained CH was not incapacitated and their intercourse was "totally consensual." *Id*. at 478.

In general, Soungpanya sought to counter the State's arguments by questioning how intoxicated CH actually was at the time of the alleged assault and suggesting she lied about being raped because her parents were angry about her drinking. On cross-examination, Soungpanya elicited evidence that CH communicated coherently with medical staff and law enforcement at the hospital. Soungpanya also attempted to discredit CH by highlighting inconsistent statements she made to Musser at the hospital and establishing that CH's parents did not want her to drink.

Soungpanya also offered some evidence through cross-examination that CH could have been intoxicated without showing it. Montgomery and Louis both acknowledged that heavy drinkers can sometimes appear sober even when drunk. And Montgomery stated that CH did not appear "actively intoxicated" during the sexual assault examination. VRP (Dec. 3, 2019) at 296.

3.      Cross-examination of Soungpanya

During cross-examination, Soungpanya reiterated that CH did not seem to be under the influence. The State asked, "You testified that [CH] was not drunk at all when you saw her?" Soungpanya responded, "Yes." VRP (Dec. 4, 2019) at 539. Soungpanya said he did not smell any alcohol on CH's breath. Soungpanya testified he did not see CH drinking, she did not appear to be under the influence of drugs, and she seemed "totally normal." *Id*. at 541.

The State tried to discredit Soungpanya by highlighting inconsistent statements he made about whether he had been in Vancouver the day of the rape. Soungpanya acknowledged that, contrary to his testimony at trial, he initially told Boswell during his prearrest interview he had not been in Vancouver in February 2017. He also acknowledged that he failed to mention purchasing a van and never told Boswell he had intercourse with a woman in Vancouver in February 2017. Soungpanya's counsel did not object to this impeachment.

The State cross-examined Soungpanya about comments he made during the jail phone call that had been played for the jury. Soungpanya argued that evidence of the phone call violated his right against self-incrimination because that call was also the basis for a no contact order violation. The trial court ruled that because Soungpanya waived his Fifth Amendment rights regarding the rape charge by testifying at trial, the State could inquire about statements related to the rape that Soungpanya made during the phone call, so long as it did not ask questions that elicited information

about any unrelated offenses. Soungpanya then acknowledged that he made statements about the rape charges during his jail phone call, including his comment that CH was "[s]ome stupid-a** b***h" who had "want[ed] to get drunk and go walk around and act stupid." *Id*. at 516.

4.      Closing arguments

During its closing argument, the State primarily focused on the implausibility of Soungpanya's version of events—that CH approached a complete stranger at a bus stop, started hugging him, and consented to intercourse outside on a cold February day even though she had a boyfriend, who she had just seen the night before. Soungpanya's version of events was especially implausible in light of CH's injuries. The State also attempted to discredit Soungpanya by pointing out the inconsistency between his statements to Boswell, who first contacted him, and his testimony. The State suggested Soungpanya had no choice but to claim he had consensual intercourse with CH after learning that his DNA was found on CH's body, but he did not mention having consensual intercourse with anyone when he spoke with Boswell because he did not yet know about the DNA evidence. Defense counsel objected to argument about the statements to Boswell on the basis that they violated Soungpanya's right to silence, and the trial court overruled the objections.

The State also sought to undermine Soungpanya's credibility by highlighting the jail phone call, questioning, "If this had been a consensual encounter like he says it was, why didn't he say that on the jail call?" *Id*. at 587. The State pointed out that Soungpanya's comments during the jail call suggested he knew CH was drunk, because "[h]e didn't say [the intercourse] was consensual. He said some stupid-a** b***h wanted to get drunk and act stupid." *Id*. at 628-29. Soungpanya did not object to this comment.

The State also argued that the jury should find CH's testimony credible because she spoke openly about her drinking problems even though it did not make her "look good." *Id*. at 577. The prosecutor asked the jury to consider the "reasonableness of what [CH] has told you." *Id*. at 576. "[CH] is telling you the entire truth." *Id*. at 577. Defense counsel raised a standing objection to vouching. The prosecutor also told the jury that CH had no motive to lie and was forthcoming with authorities, spoke truthfully, and her story had a "ring of truth to it" because the physical evidence corroborated it. *Id*. at 578. The prosecutor then summarized the State's burden by explaining that if the jury had an abiding belief in the truth of the charges, that CH told the truth, and the State met the elements of the offense, the jury had to convict.

Defense counsel's primary argument in closing was that CH consented to have intercourse with Soungpanya, then later invented a story about being raped in order to garner sympathy from her stepmother, who was angry because CH had been drinking. Defense counsel repeatedly argued that CH unambiguously consented to intercourse with Soungpanya. Defense counsel's final comment to the jury focused on actual consent: "Mr. Soungpanya is entitled to . . . reasonable doubt[] regardless of what you think of casual sex in today's society. . . . It's about whether or not two consenting adults had an interlude or not." *Id.* at 616.

Soungpanya's counsel further cast doubt on the State's arguments about CH's intoxication, arguing CH could have consumed alcohol *after* having intercourse with Soungpanya instead of before and pointing out that she drank shots much earlier that morning. Counsel argued, "[T]here was no evidence of impairment when she was with Mr. Soungpanya." *Id*. at 608. "He is innocent right now unless and until they have proven beyond a reasonable doubt that he shoved her and had

10

sex with her and left her there or that she was so drunk that she couldn't consent to sex. That evidence isn't there." *Id*. at 612.

Soungpanya's counsel also suggested twice during closing argument that CH could have been intoxicated without reasonably appearing too drunk to consent. "If a trained expert like Brigitte Montgomery couldn't tell [if she was intoxicated to the point of incapacity] . . . how do you expect Mr. Soungpanya to know somebody who's walking and talking and who says, I am an alcoholic and ha[ve] a high tolerance, is not fully capable of consent?" *Id*. at 604. "To convict this man of rape you have to be convinced that he forced himself on [CH] when he knew she was drunk and not capable of consent despite all of her actions that she took to engage in sex with him." *Id*. at 611. But later, defense counsel reverted to relying on lack of evidence of intoxication (rather than what Soungpanya knew about CH's intoxication) by repeating two more times what was required for conviction. "The issue is can they prove beyond a reasonable doubt that he shoved her down and had sex with her, or she was so drunk at the time that she was with Mr. Soungpanya that she couldn't consent to the sex they had. That evidence is just not there." *Id.* at 614-15.[2]

The jury convicted Soungpanya of second degree rape.

---

[2] Soungpanya does not raise a unanimity argument on appeal.

No. 54455-5-II

G.     Sentencing

Soungpanya stipulated to an offender score of 4, which included a 2018 Idaho conviction for possession of a controlled substance. The trial court sentenced Soungpanya to the high end of the standard range, 147 months to life, with lifelong community custody conditions after release.

One community custody condition mandated sexual deviancy treatment and certain reporting requirements:

> You shall obtain an evaluation for sexual deviancy conducted by a Washington State certified sexual deviancy treatment provider approved by [the Department of Corrections]. You shall comply and cooperate with any recommended treatment. . . . "Cooperate with" means you shall follow all treatment directives, accurately report all sexual thoughts, feelings and behaviors in a timely manner and cease all deviant sexual activity. You shall comply with all requirements, restrictions, and rules of all recommended treatment program(s).

Clerk's Papers (CP) at 172. Another condition prohibited Soungpanya from "possess[ing], us[ing], access[ing], or view[ing] . . . any material depicting any person engaged in sexually explicit conduct as defined by RCW 9.68A.011(4) unless given prior approval by [the Department of Corrections] and your sexual deviancy treatment provider." CP at 173.

The trial court found Soungpanya indigent and orally "waive[d] discretionary legal financial obligations." VRP (Jan. 17, 2020) at 27. The judgment and sentence nonetheless imposed community custody supervision fees.

Soungpanya appeals his conviction and sentence and raises additional arguments for reversal in a SAG.

12

ANALYSIS

I. INEFFECTIVE ASSISTANCE OF COUNSEL

Soungpanya argues his trial counsel was ineffective because she did not request a jury instruction on RCW 9A.44.030(1)'s affirmative defense to second degree rape. Soungpanya asserts that this affirmative defense provides that a jury may acquit a defendant who proves by a preponderance of the evidence that they reasonably believed the victim was not incapacitated. Soungpanya argues that without the instruction, the jury did not realize it could acquit him if it believed CH did not *reasonably appear* incapacitated even if it also believed that CH actually *was* intoxicated to the point of incapacity.

The State counters that defense counsel's performance was not deficient because counsel could have strategically chosen not to undertake a burden to prove the affirmative defense. The State contends Soungpanya reasonably chose to argue instead that the evidence did not show incapacitation, which did not impose a burden of proof on Soungpanya. We agree with the State.

A.      Ineffective Assistance Generally

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Soungpanya must show that his counsel's performance was deficient and counsel's deficient performance prejudiced him. *Grier*, 171 Wn.2d at 32-33. A failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

The defendant has the burden of demonstrating that defense counsel's performance was deficient based on the trial court record. *State v. Vazquez*, __ Wn.2d ___, 494 P.3d 424, 431 (2021).

A defendant "'must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct.'" *Id.* (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)). Appellate courts give "exceptional deference" to "counsel's strategic decisions." *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). "To rebut the presumption of reasonableness, a defendant must establish an absence of any legitimate trial tactic that would explain counsel's performance." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017).

Even if an appellate court concludes that counsel's performance was deficient, the defendant must also show that, but for counsel's deficient performance, "there is a reasonable probability that the result of the proceeding would have been different." *Id.* at 538. We examine the "practical effect" of alleged ineffective assistance. *See State v. Buckman*, 190 Wn.2d 51, 64, 409 P.3d 193 (2018).

B.     Second Degree Rape and Reasonable Belief Affirmative Defense

Under RCW 9A.44.050(1)(a)-(b), "A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person . . . [b]y forcible compulsion" or "[w]hen the victim is incapable of consent by reason of being . . . mentally incapacitated." Rape in the second degree does not require intent or any other mental state. *See State v. Brown*, 78 Wn. App. 891, 896, 899 P.2d 34 (1995).

Under RCW 9A.44.030(1), an affirmative defense to second degree rape charged under the incapacity prong exists where "at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated." The defendant bears the burden of proving this

affirmative defense by a preponderance of the evidence. RCW 9A.44.030(1). The defendant is entitled to this jury instruction "if there is substantial evidence in the record supporting [the reasonable belief] theory." *See State v. Powell*, 150 Wn. App. 139, 154, 206 P.3d 703 (2009).[3]

An attorney's failure to request an instruction on RCW 9A.44.030(1)'s reasonable belief affirmative defense may be deficient performance. In *Powell*, it was deficient performance for counsel not to "request a 'reasonable belief' instruction when (1) the evidence supported such an instruction; (2) defense counsel, in effect, argued the statutory defense; and (3) the statutory defense was *entirely consistent with* the defendant's theory of the case." *Id.* at 155 (emphasis added). And in *In re Personal Restraint of Hubert*, Division One held that defense counsel's performance was deficient where counsel failed to request a reasonable belief instruction because he did not know the affirmative defense existed, so the failure could not have been a strategic decision. 138 Wn. App. 924, 929, 158 P.3d 1282 (2007).

But because the reasonable belief affirmative defense places a burden of proof on the defendant, it may also be a legitimate tactical decision *not* to request a reasonable belief instruction. In *State v. Coristine*, decided after *Powell* and *Hubert*, Coristine testified that the victim "did not 'appear' drunk," but Coristine's counsel explicitly said that they did not want to invoke the

---

[3] RCW 9A.44.030(1) provides, "In any prosecution under this chapter in which lack of consent is based *solely* upon the victim's mental incapacity or upon the victim's being physically helpless, it is a defense which the defendant must prove by a preponderance of the evidence that at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated and/or physically helpless." At oral argument, the State for the first time raised the issue of whether this defense is permissible in a case where *both* forcible compulsion and incapacitation are alleged. But we decline to address this argument raised for the first time in oral argument because doing so is unnecessary to resolve this case.

reasonable belief affirmative defense. 177 Wn.2d 370, 379, 300 P.3d 400 (2013). The trial court nevertheless instructed the jury on the defense. *Id.* at 378.

Although *Coristine* was not an ineffective assistance of counsel case, it is helpful here to the extent the Washington Supreme Court emphasized that strategic reasons may support a decision not to invoke the reasonable belief affirmative defense. *Id.* at 383. The Supreme Court explained that failure to request an instruction on the reasonable belief affirmative defense may sometimes "fall below the constitutional minimum for effective representation," but in that case, not requesting the instruction was a "valid strategic decision." *Id.* at 379. Coristine's testimony "supported his argument that [the victim] was not in fact incapacitated or helpless," rather than the reasonable belief affirmative defense. *Id.* The Supreme Court further explained that the decision was a matter of trial tactics because "[a]n affirmative defense places a burden of proof on the defendant, thus shaping the defense by introducing elements it must prove" and "may influence a wide range of strategic trial decisions." *Id.* at 378. The Supreme Court held that the trial court erred by giving the reasonable belief instruction over the defendant's objection because doing so violated the defendant's Sixth Amendment right to control his defense. *Id.* at 378-79.

Here, some evidence, such as Montgomery's testimony that a heavy drinker might be intoxicated without showing obvious signs of drunkenness, could have supported the reasonable belief affirmative defense. Defense counsel used this evidence to argue in closing that "[i]f a trained expert like Brigitte Montgomery couldn't tell" whether CH was drunk, Soungpanya should not have been expected to notice either. VRP (Dec. 4, 2019) at 604.

But to prevail on an ineffective assistance claim, Soungpanya must overcome a strong presumption of effective assistance of counsel by demonstrating that there was no legitimate

tactical reason not to request a reasonable belief jury instruction. *Lui*, 188 Wn.2d at 539. Here, as in *Coristine*, evidence that could have supported a reasonable belief affirmative defense also "served to cast doubt on the State's case, consistent with" Soungpanya's defense that CH was not intoxicated or incapacitated, and that she actively consented to intercourse. 177 Wn.2d at 379. Soungpanya testified that CH acted "totally normal," that he did not smell alcohol on her breath, and she did not appear to be under the influence of any substance. VRP (Dec. 4, 2019) at 541. Similarly, Soungpanya stated that CH affirmatively agreed to "go to a more private area" and participated actively in intercourse. *Id.* at 462. Defense counsel repeatedly argued in closing that the State failed to prove beyond a reasonable doubt that CH was incapacitated. This evidence and argument supported Soungpanya's theory that CH was not in fact incapacitated or helpless. The existence of evidence supporting the reasonable belief affirmative defense is not alone sufficient to conclude that counsel's performance was deficient in these circumstances because it was also legitimate strategic choice to argue that CH was not intoxicated. *See Coristine*, 177 Wn.2d at 379.

It is a conceivably legitimate tactic for defense counsel to avoid shouldering a burden of proof imposed by an affirmative defense if other avenues for raising reasonable doubt exist. The reasonable belief affirmative defense would have required Soungpanya to persuade the jury by a preponderance of the evidence that Soungpanya reasonably did not think CH was too intoxicated to consent. But Soungpanya himself insisted that CH actively sought out, participated in, and unambiguously consented to intercourse. And defense counsel developed testimony and argued in closing that CH was not in fact intoxicated when they had intercourse. The reasonable belief affirmative defense would have been at odds with Soungpanya's own testimony and the theory that the State failed to prove incapacity, which also had the advantage of not undertaking a burden

17

of proof. Accordingly, it did not fall below an objective standard of reasonableness for defense counsel to instead focus on raising reasonable doubt and advance the more congruent theory that CH had consensual intercourse with Soungpanya, that she was not intoxicated or incapacitated, and that she made up a story about being raped to garner sympathy from her stepmother.

To the extent defense counsel also argued in closing that Soungpanya may not have known CH was intoxicated, this comment does not alone support a conclusion that defense counsel had to request an instruction on the reasonable belief affirmative defense in order for the jury to make sense of Soungpanya's argument. Soungpanya is correct that in *Coristine*, counsel did not make an argument about what the defendant reasonably believed, which distinguishes this case from *Coristine*. 177 Wn.2d at 374. Although defense counsel may have wanted to raise Soungpanya's understanding of CH's level of intoxication, it was also a legitimate tactic to rely exclusively on the State's heavy burden to prove incapacity rather than potentially confuse the jury by adding a defense burden to prove reasonable belief by a preponderance of the evidence. *Id.* at 381 (discussing the confusion about burdens of proof that an affirmative defense could cause and explaining that the reasonable belief instruction interfered with Coristine's straightforward presentation of the defense that the victim was not incapacitated).

Moreover, this case is not analogous to *Powell*. In *Powell*, "the statutory defense was entirely consistent with the defendant's theory of the case." 150 Wn. App. at 155. Here, by contrast, the reasonable belief defense would have been inconsistent with Soungpanya's primary arguments. Soungpanya argues that *Powell* established the jury would only reach the affirmative defense and its preponderance burden if it first concluded the State had met its burden to prove all of the elements of second degree rape. But this argument ignores that avoiding jury confusion about

burdens was a legitimate reason for a defendant to avoid the reasonable belief affirmative defense instruction. *See Coristine*, 177 Wn.2d at 381. Moreover, throughout closing, Soungpanya's primary argument was that CH *was not* intoxicated and that she affirmatively consented to and willingly participated in intercourse with Soungpanya. This argument was not "entirely consistent" with a defense that CH *was* intoxicated but Soungpanya reasonably believed CH had capacity to consent. *See Powell,* 150 Wn. App at 155.

In sum, Soungpanya has failed to show that defense counsel's performance was deficient. Accordingly, we need not reach prejudice. *Hendrickson*, 129 Wn.2d at 78. We hold that Soungpanya is not entitled to reversal due to ineffective assistance of counsel.[4]

## II.  PROSECUTORIAL MISCONDUCT

Soungpanya argues that the prosecutor committed misconduct during the State's cross-examination and closing argument. We disagree.

A.     Prosecutorial Misconduct Generally

Prosecutorial misconduct may deprive a defendant of their constitutional right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington Constitution. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). We review the prosecutor's arguments "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given." *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

---

[4] Even if we were to reach prejudice, the jury heard the recording of a jail phone call where Soungpanya referred to CH as "drunk," which directly contradicted his testimony at trial. VRP (Dec. 4, 2019) at 516. Soungpanya's own statement in the jail recording seriously undermined any argument that he did not know she was intoxicated.

To establish prosecutorial misconduct, the defendant must prove that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). If the defendant objected to the alleged misconduct at trial, they may establish prejudice by showing that the misconduct "had a substantial likelihood of affecting the jury's verdict." *Id.* at 760. Unless otherwise indicated below, Soungpanya properly objected to each instance of alleged misconduct.

In the absence of an objection, the defendant must show (1) that comments were improper, (2) that the prosecutor's comments were both flagrant and ill intentioned, (3) that the effect of the improper comments could not have been obviated by a curative instruction, and (4) there is a substantial likelihood the misconduct affected the verdict. *Id*. at 760-61. Where an objection was not lodged, we will "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id*. at 762.

Prosecuting attorneys "'are permitted latitude to argue the facts in evidence and reasonable inferences' in their closing arguments." *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003) (quoting *State v. Smith*, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)). They cannot use their "position of power and prestige to sway the jury" or to "express an individual opinion of the defendant's guilt, independent of the evidence actually in the case." *Glasmann*, 175 Wn.2d at 706. They cannot misstate the law. *State v. Jones*, 13 Wn. App. 2d 386, 403, 463 P.3d 738 (2020). Although an attorney may not personally vouch for a witness's credibility, the prosecutor may "argue an inference from the evidence, and prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." *State v. Brett,* 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

It can be "flagrant misconduct to shift the burden of proof to the defendant." *State v. Miles*, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007). The State may not "comment on the lack of defense evidence because the defendant has no duty to present evidence." *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). "However, a prosecutor is entitled to point out the improbability or lack of evidentiary support for the defense theory." *State v. Osman*, 192 Wn. App. 355, 367, 366 P.3d 956 (2016).

B.       Burden Shifting

Soungpanya claims the prosecutor improperly shifted the burden of proof by stating during closing argument that "everything [Soungpanya] testified to came from his mouth and his mouth alone. There is nothing to corroborate what he said. There is zero evidence backing up anything that he said. The physical evidence, the injuries, do not match up with what he said at all." VRP (Dec. 4, 2019) at 627. But because the prosecutor may "point out the . . . lack of evidentiary support for the defense theory," the prosecutor here did not commit misconduct. *Osman*, 192 Wn. App. at 367. Rather, the prosecutor properly observed that the evidence at trial did not support Soungpanya's story. We reject this claim.

Soungpanya next asserts that the prosecutor "subtly mischaracterized the State's burden and misstated the law" by stating that if the jury had "an abiding belief that [CH] told you the truth," it had to find Soungpanya guilty. Br. of Appellant at 20 (emphasis omitted); VRP (Dec. 4, 2019) at 573. Soungpanya's counsel did not object to this statement. The prosecutor did not shift the burden here because she did not actually tell the jury that having an abiding belief in the truth of CH's testimony was alone enough to convict. Rather, the prosecutor told the jury that if it had an abiding belief "in the truth of the charges," that CH "told you the truth," and "that this defendant

21

had sex with her, either by force or when she was incapable of consent, then it is your duty to find him guilty." VRP (Dec. 4, 2019) at 573. Earlier in her argument, the prosecutor told the jury the State had the burden of proving the crime beyond a reasonable doubt, explaining, "If from [full, fair, and careful] consideration you have an abiding belief in the truth of the charge you are satisfied beyond a reasonable doubt." *Id.* at 563. Soungpanya's counsel did not object to these statements. The State properly acknowledged its burden and did not shift the burden of proof to Soungpanya.

Finally, Soungpanya contends that the State shifted the burden of proof to him during cross-examination when the prosecutor asked Soungpanya whether he could have found a bill of sale for the van he said he purchased in Vancouver. Soungpanya argues this question improperly required him to prove a fact. There is no evidence that the prosecutor's question about the bill of sale for the van "had a substantial likelihood of affecting the jury's verdict," however. *Emery*, 174 Wn.2d at 760. Soungpanya cannot show prejudice and we reject this claim.

C.    Vouching

Soungpanya argues the prosecutor committed misconduct by vouching for CH's credibility during closing argument when she described CH's testimony as "totally truthful and forthcoming," and said that CH was telling "the entire truth." Br. of Appellant at 21 (emphasis omitted).

The prosecutor's comment that CH was truthful and forthcoming occurred during a discussion of CH's credibility in light of the corroborating evidence and the consistency of her story. The prosecutor prefaced the remark by stating, "Look at the reasonableness of what they're saying in light of all of the other evidence, what the instruction tells you to look at that. Look at the reasonableness of what [CH] has told you." VRP (Dec. 4, 2019) at 576. We hold that the

prosecutor's comment here was a permissible inference from the evidence and not a personal opinion. *Brett*, 126 Wn.2d at 175. The prosecuting attorney did not vouch for CH.

D.      Adverse Inferences

1.      Prearrest silence

Soungpanya argues the prosecutor engaged in misconduct by "repeatedly urg[ing] the jury to infer guilt from Mr. Soungpanya's exercise of his constitutional right to silence" by pointing out that Soungpanya did not tell Boswell that CH consented to intercourse with him. Br. of Appellant at 25. The State responds that these statements were not improper because "when a defendant willingly speaks with the police, the State may comment on what they do and do not say." Br. of Resp't at 21. We hold that no misconduct occurred.

The State may not "'unnecessarily chill or penalize the assertion of a constitutional right'" or "'draw adverse inferences from the exercise of a constitutional right.'" *State v. Martin*, 151 Wn. App. 98, 104, 210 P.3d 345 (2009) (internal quotation marks omitted) (quoting *State v. Gregory*, 158 Wn.2d 759, 806, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014)). The Fifth Amendment and article I, section 9 of the Washington Constitution protect a defendant from self-incrimination. *State v. Pinson*, 183 Wn. App. 411, 416-17, 333 P.3d 528 (2014). "When defendants take the stand, their prearrest silence may be used to impeach their testimony." *State v. Burke*, 163 Wn.2d 204, 206, 217, 181 P.3d 1 (2008) ("[N]o constitutional protection is violated if a defendant testifies at trial and is impeached for remaining silent *before* arrest and before the State's issuance of *Miranda* [*v. Arizona*, 384 U.S. 436, 86 S. Ct 1602, 16 L. Ed. 2d 694 (1966)] warnings." (emphasis added)). Division Three has observed, "Impeachment in this context typically emphasizes the defendant's failure to present the

same exonerating evidence to law enforcement that the defendant testified about at trial." *State v. Cook*, 17 Wn. App. 2d 96, 108, 484 P.3d 13 (2021). Soungpanya has failed to cite to any case holding that a defendant cannot be impeached on this basis.

Viewed in context, none of the challenged statements was an unconstitutional comment on Soungpanya's right to silence. The statements to which Soungpanya objected occurred in the context of a discussion of Soungpanya's credibility. The prosecutor observed that Soungpanya testified at trial that he had consensual intercourse with CH, but never mentioned having intercourse with anyone when he spoke to Boswell. This comment identified an *omission* in the story Soungpanya told Boswell, but the prosecutor never mentioned an invocation of the right to remain silent or that Soungpanya chose not to answer any particular question.

The prosecutor also did not commit misconduct when she noted, "[H]e admitted [on cross-examination] that he[] [was] not forthcoming with the detective" because "he figure[d] she was trying to pin something on him so he is not going to be forthcoming with information." VRP (Dec. 4, 2019) at 583. This statement, like the previous one, referred to an omission that was inconsistent with Soungpanya's trial testimony, not his prearrest silence. And when the prosecutor noted that Soungpanya was apparently unable to recall "[a] lot of memorable things [that] occurred that day," she simply described another discrepancy between his past story and his trial testimony. *Id*. at 585.[5] These questions and the prosecutor's closing argument "emphasize[d] the defendant's failure to present the same exonerating evidence to law enforcement that the defendant testified about at trial." *Cook*, 17 Wn. App. 2d at 108.

---

[5] To the extent Soungpanya suggests the prosecutor drew an improper adverse inference from the jail phone call, we reject this argument because a phone call to a friend does not implicate these constitutional protections against self-incrimination.

We hold that none of the comments about Soungpanya's prior statements to Boswell violated his constitutional rights. Soungpanya is not entitled to reversal on this basis.

2.      Constitutional right to trial

Soungpanya claims the prosecutor also committed misconduct by subtly urging the jury to penalize him "for exercising his constitutional right to trial" by asking CH if she had to take time off work to testify. Br. of Appellant at 25. We disagree. Soungpanya did not object below on this basis and has not shown the requisite prejudice because he offers no evidence that this passing question and answer had any effect on the outcome of the trial. *See Emery* 174 Wn.2d at 760. Nor does he show that a curative instruction would have been ineffective.

Soungpanya is not entitled to reversal due to prosecutorial misconduct.

III.      RESENTENCING UNDER *BLAKE*

In *Blake*, the Supreme Court held that the felony drug possession statute, former RCW 69.50.4013(1) (2017), was unconstitutional and void. 197 Wn.2d at 195. Soungpanya argues that we must remand for resentencing because his sentence was based on a legally incorrect offender score. He contends that his Idaho conviction for possession of a controlled substance could not be properly included in his offender score because only foreign convictions that were comparable to a valid Washington offense upon sentencing could be included.

The State concedes that Soungpanya should be resentenced. Division One very recently held that out-of-state convictions "must be comparable to a *valid* Washington offense to be included in the calculation of the offender score." *State v. Markovich*, ___ Wn. App. 2d ___, 492 P.3d 206, 216 (2021) (emphasis added). Division One remanded for resentencing where the

defendant's offender score included an out-of-state conviction for possession of a controlled substance. *Id.*

Here, Soungpanya pleaded guilty to possession of a controlled substance in Idaho in 2018. Even though the Idaho statute was narrower than former RCW 69.50.4013(1) because the Idaho statute did not criminalize unwitting possession, there was no valid statute in Washington that the Idaho conviction could be compared to. *See Blake*, 197 Wn.2d at 186, 195. As a result, even if the Idaho conviction remains constitutionally valid, it cannot be counted toward Soungpanya's offender score in Washington. *See id*; *see also State v. Ammons*, 105 Wn.2d 175, 187-88, 713 P.2d 719, 718 P.2d 796 (1986).

We accept the State's concession and remand for the trial court to recalculate Soungpanya's offender score and resentence him.

## IV. COMMUNITY CUSTODY CONDITIONS

A.    Sexual Deviancy Reporting Requirement

Soungpanya challenges the community custody condition that required him to seek a sexual deviancy evaluation and cooperate with any recommended treatment. The condition instructed Soungpanya that "'[c]ooperate with' means you shall follow all treatment directives, *accurately report all sexual thoughts, feelings and behaviors in a timely manner* and cease all deviant sexual activity. You shall comply with all requirements, restrictions, and rules of all recommended treatment program(s)." CP at 172 (emphasis added). Soungpanya argues that the condition violates the First Amendment because it compels speech and is not narrowly tailored to a compelling government interest. Soungpanya further argues that the requirement that he report all sexual "behavior" does not exempt behavior about which he would have a Fifth Amendment

right to remain silent. Br. of Appellant at 37. Soungpanya asks this court to remand for the trial court to modify this condition.

The State agrees with Soungpanya that the reporting requirement should be limited to reporting only thoughts, feelings, and behaviors related to nonconsensual sex because he should not be required to "report[] legal activities that the State has no interest in" regulating. Br. of Resp't at 26.

Appellate courts review community custody conditions for abuse of discretion. *State v. Johnson*, 197 Wn.2d 740, 744, 487 P.3d 893 (2021). The trial court abuses its discretion when its decision is manifestly unreasonable or untenable. *Id.* "It is manifestly unreasonable to impose an unconstitutional condition of community custody. But '[l]imitations upon fundamental rights are permissible, provided they are imposed sensitively.'" *Id.* (alteration in original) (citations omitted) (quoting *State v. Riley*, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993)). Conditions may be imposed that impact free speech rights if reasonably necessary, but they must be "sensitively imposed." *Id.* at 751; *State v. Bahl*, 164 Wn.2d 739, 757, 193 P.3d 678 (2008).

RCW 9.94A.703(3)(c)-(d) permit sentencing courts to impose community custody conditions that require defendants to "[p]articipate in crime-related treatment or counseling services" and "[p]articipate in rehabilitative programs or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offenders risk of reoffending, or the safety of the community." Thus, it is clearly within the trial court's authority to require compliance with treatment directives. But we accept the State's concession regarding the thoughts, feelings, and behavior reporting requirement. To the extent this condition requires Soungpanya to disclose thoughts and feelings about consensual sexual activities, it compels speech about legal behavior

that the State cannot regulate and so cannot be "sensitively imposed" in accord with constitutional requirements. *Bahl*, 164 Wn.2d at 757.

The State's goals are fully addressed by the requirements that Soungpanya comply with treatment directives and cease all deviant sexual behavior, which is consistent with the statutory authority described in RCW 9.94A.703(3)(c)-(d). The trial court should therefore strike the clause that requires Soungpanya to "accurately report all sexual thoughts, feelings, and behaviors in a timely manner." CP at 172. This also disposes of Soungpanya's argument that the condition requires reporting of behaviors in violation of the Fifth Amendment. We remand for the trial court to strike this clause from the community custody conditions.

B.      Prohibition on Accessing Any Material Depicting Sexually Explicit Conduct

Soungpanya argues this court should remand for the trial court to strike or modify "the condition prohibiting access to 'material depicting any person engaged in sexually explicit conduct'" because it is unconstitutionally vague. Br. of Appellant at 33-34 (underscore omitted). The State concedes this condition should be stricken or modified, and we accept the State's concession.

The Supreme Court held a similar community custody condition unconstitutionally vague in *State v. Padilla*, 190 Wn.2d 672, 682, 416 P.3d 712 (2018). There, the court concluded that a prohibition on viewing "pornographic materials," which was defined to include "'images of sexual intercourse . . . [and] the display of intimate body parts,'" was unconstitutionally vague because it "would unnecessarily encompass movies and television shows not created for the sole purpose of sexual gratification." *Id.* at 681; *see also In re Pers. Restraint of Sickels*, 14 Wn. App. 2d 51, 65-66, 469 P.3d 322 (2020).

We reverse and remand for the trial court to strike or modify this community custody condition to avoid unconstitutional vagueness and overbreadth.

V. COMMUNITY CUSTODY SUPERVISION FEE

Soungpanya argues that the community custody supervision fee should be stricken because he was indigent, the supervision fees are discretionary legal financial obligations (LFOs), and the trial court orally ruled it intended to waive discretionary LFOs. The State concedes the supervision fees should be stricken, and we accept the State's concession.

"Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the [Department of Corrections]." RCW 9.94A.703(2)(d). Because the trial court may waive supervision fees, they are discretionary LFOs. *State v. Spaulding*, 15 Wn. App. 2d 526, 537, 476 P.3d 205 (2020). Based on the plain language of RCW 9.94A.703(2)(d), the trial court had discretion to waive the supervision fees. It appears that is what the trial court intended to do, and the State concedes that the community custody supervision fee provision should be stricken. As a result, we remand for the trial court to strike the community custody supervision fee provision from the judgment and sentence.

VI.  SAG ARGUMENTS

A.    Matters Outside the Record and Issues Already Raised by Counsel

Soungpanya contends the State did not sufficiently investigate the alleged rape because he asserts it should have obtained surveillance video footage from the bus stop. Soungpanya further argues that defense counsel was ineffective because she lied to him and did not follow his instructions for representation.

Under *McFarland*, "If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition." 127 Wn.2d at 335. Because the alleged surveillance footage is not in the record, this court cannot determine whether it would have been exculpatory. Soungpanya also does not point to any evidence in the record establishing that defense counsel was dishonest with him or did not honor his right to present a defense. We do not further consider these arguments. *See id.*

Soungpanya also argues that the prosecutor improperly shifted the burden of proof by "using my silence against me." SAG at 2 (Ground 8). This assertion replicates an argument made by his appellate counsel. Because we reject that argument above, this claim also fails.

B.    Other Arguments

1.    Attempt to discharge counsel

Soungpanya claims he is entitled to reversal because the trial court "automatically denied" his request to discharge defense counsel without a hearing. SAG at 1 (Ground 1). We disagree because the trial court thoroughly considered Soungpanya's request. Soungpanya wrote a letter expressing his desire to fire his lawyer, who read the letter aloud to the court before trial. The trial court confirmed that the letter reflected his request and allowed Soungpanya to make additional

argument. The State and defense counsel both responded to Soungpanya's request. The trial court's denial was not automatic and Soungpanya is not entitled to relief on this basis.

2.      Ineffective assistance of counsel

Soungpanya argues that his trial counsel was ineffective because she missed court dates, only met with him once to prepare his case, and failed to interview the State's forensic scientists.

Although defense counsel's colleague appeared on Soungpanya's behalf at one pretrial hearing, there is no evidence she missed court dates. And although scheduling conflicts delayed interviewing two witnesses, Soungpanya's counsel ultimately interviewed all of the State's witnesses, including both forensic scientists, before they testified. In sum, the evidence is not sufficient to establish that defense counsel's level of preparation or overall performance fell below an objective standard of reasonableness, considering all the circumstances. *Grier*, 171 Wn.2d at 33.

Soungpanya also argues that defense counsel's representation was ineffective because she did not explain what a probable cause statement was in her closing argument, which he asserts would have clarified his anger in the jail phone call, which he says arose from seeing the accusations in the probable cause statement. We reject this argument because there is no evidence Soungpanya was prejudiced.

Soungpanya further asserts his counsel was ineffective because she incorrectly said during her opening statement that CH was drinking alcohol at the bus stop and offered some to Soungpanya, which he argues was not true and did not match his testimony. Even if Soungpanya's testimony contradicted his counsel's opening, he does not show how this prejudiced him. There was ample other evidence that CH had been drinking before Soungpanya encountered her, and

Soungpanya has not established that defense counsel's comment affected the outcome of the case. *See Buckman*, 190 Wn.2d at 64.

 3. CH's impairment

Soungpanya argues his conviction must be overturned because evidence at trial proved CH was not incapacitated.

To the extent Soungpanya challenges the sufficiency of the evidence required for a second degree rape conviction, the State had to prove beyond a reasonable doubt that he "engage[d] in sexual intercourse" with CH by "forcible compulsion" or when CH was "incapable of consent by reason of being physically helpless or mentally incapacitated." RCW 9A.44.050(1)(a)-(b). Evidence is sufficient if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Yishmael*, 195 Wn.2d 155, 177, 456 P.3d 1172 (2020). We draw all reasonable inferences in favor of the State and assume the truth of the State's evidence. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019), *cert. denied*, 140 S. Ct. 834 (2020). We cannot review the trier of fact's credibility determinations. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Viewing the evidence in the light most favorable to the State, a rational jury could have convicted Soungpanya if it found CH a credible witness and believed CH's testimony. SH said that CH appeared intoxicated when she arrived home, which also supported CH's testimony. The urine test confirmed that CH had consumed alcohol earlier that day. While Soungpanya testified that CH did not appear under the influence of anything, we may not second-guess the jury's credibility determinations. *Id.* at 71. Moreover, CH's injuries, including widespread bruising and scrapes on her face, also supported conviction under the forcible compulsion prong. RCW

9A.44.050(1)(a). We reject this argument because the evidence was sufficient to support a conviction for second degree rape.

4.      Evidence about Soungpanya's criminal history

Soungpanya asserts that his 2016 forgery conviction was improperly admitted. But this evidence was properly admitted for impeachment under ER 609, because it was a crime of dishonesty that was less than 10 years old.

5.      Jail phone calls

Soungpanya contends that evidence relating to the jail phone call was improperly admitted. Soungpanya appears to argue that the trial court erred by directing him to answer questions about the content of the jail phone call over his attempted invocation of the Fifth Amendment on the grounds that the phone call was the basis of a separate no contact order violation.

"'[W]hen an accused voluntarily takes the stand he waives his constitutional rights [against self-incrimination] as to all matters concerning which cross-examination is otherwise normally proper.'" *State v. Hart,* 180 Wn. App. 297, 304, 320 P.3d 1109 (2014) (second alteration in original) (internal quotation marks omitted) (quoting *State v. Robideau*, 70 Wn.2d 994, 1001, 425 P.2d 880 (1967)). Here, the trial court properly limited the State's cross-examination about the jail phone calls to discussions about the rape charge, because Soungpanya testified about the circumstances surrounding the rape, including whether CH was impaired on that day, and so he waived his privilege against self-incrimination for this charge. The State did not ask about who Soungpanya called or otherwise elicit evidence that the phone call was improper in any way. The trial court did not violate Soungpanya's Fifth Amendment rights by allowing the State to cross-

examine him about the statements he made during jail phone calls that were related to the rape, including his statement that CH was drunk. *See id.* at 304-05.

6.      Prosecutorial misconduct

Soungpanya argues that the prosecutor was prejudiced against him because she argued poverty made him "not worthy" of having intercourse with CH. SAG at 2 (Ground 9). The prosecutor told the jury it made no sense to conclude that "despite being homeless, jobless, carless, penniless [Soungpanya] is able to get women to come onto him on a regular basis." VRP (Dec. 4, 2019) at 578. Because this was a reasonable inference from the evidence and did not appeal to the jury's passions or prejudices, the prosecutor showed no improper prejudice against Soungpanya. *Dhaliwal*, 150 Wn.2d at 577. We reject this claim.

7.      DNA evidence

Soungpanya argues that the existence of DNA from an unidentified individual on the vaginal swab should have raised reasonable doubt about his guilt. Soungpanya is correct that CH's vaginal swab contained DNA consistent with Soungpanya's DNA, as well as a smaller amount of DNA that was too minimal to subject to testing. To the extent Soungpanya challenges the sufficiency of the evidence for conviction on this basis, the existence of DNA from an unknown contributor was not enough to prevent a rational trier of fact from convicting Soungpanya, especially given the uncontroverted evidence that Soungpanya's DNA *was* present in CH's vaginal swab. *See Yishmael*, 195 Wn.2d at 177.

In sum, none of Soungpanya's SAG arguments warrants relief.

CONCLUSION

No. 54455-5-II

We affirm Soungpanya's conviction but remand for resentencing, to modify the challenged community custody conditions, and to strike the community supervision fees.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Lee, C.J.

Worswick, J.